Deborah **KRUEGER**, Plaintiff,

v.

Ron **MILLER** et al., Defendants.

No. CIV-2-77-59.

United States District Court,
E. D. Tennessee,
Northeastern Division.

Sept. 16, 1977.

On The Merits Jan. 27, 1978.

W. Stanley Yarbro, and Michael J. Davenport, Johnson City, Tenn., for plaintiff.

R. Jan Jennings, Nashville, Tenn., and Ed E. Williams, III, Johnson City, Tenn., for defendants.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

This is an action for monetary damages for deprivation of civil rights. 28 U.S.C. § 1343. *Inter alia*, the plaintiff claims the defendant Mr. Ron Miller was acting at the pertinent times under color of Tennessee law. 42 U.S.C. §§ 1983, 1985. Each defendant moved for an involuntary dismissal of the plaintiff's claim against him, it or her for the failure of the plaintiff to so state a claim on which relief can be granted. Rules 12(b)(6), 41(b), Federal Rules of Civil Procedure.

A United States magistrate of this district submitted to the undersigned judge a recommendation that each of those motions to dismiss, except the motion therefor of the defendant Mr. Miller, be granted. 28 U.S.C. § 636(b)(1)(B). After such recommendation was filed on August 29, 1977 with the clerk of this Court, copies thereof were mailed to all parties hereto. 28 U.S.C. § 636(b)(1)(C). The only party hereto who served and filed a timely written objection thereto was such defendant Mr. Miller. 28 U.S.C. § 636(b)(1). The undersigned judge hereby makes a de novo determination of the portion of such recommendation to which such objection was addressed. *Idem.*

Mr. Miller concurred with such magistrate's conclusion that he (Mr. Miller), as a justice of the peace of Washington County, Tennessee at the times pertinent herein, enjoyed an absolute immunity from a lawsuit seeking monetary damages for acts he did in his official capacity as a judicial officer; but, he dissented from such magistrate's further conclusion that this grant of immunity does not extend to Mr. Miller's alleged acts in arresting personally the plaintiff which, such magistrate found, were beyond Mr. Miller's jurisdiction. That contention is meritless.

Mr. Miller argues that, unless he arrested the plaintiff in his (Mr. Miller's) official capacity as a Tennessee justice of the peace, he has not deprived the plaintiff of her civil right " * * * under color of State law, * * *" 42 U.S.C. § 1983; but, that, if he arrested the plaintiff in his (Mr. Miller's) official capacity as a Tennessee justice of the peace, he is absolutely immune from liability under the provisions of 42 U.S.C. § 1983. This (somewhat ingenious) theory is baseless: for the purposes of his motion to dismiss,* Mr. Miller admitted the material allegation of the complaint, that he was acting at the pertinent times under color of Tennessee law. *Jenkins v. McKeithen* (1969), 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.(2d) 404, 416–417[5] (per Marshall, J., Warren, Ch. J., and Brennan, J.).

The aforesaid recommendations of the magistrate hereby are ACCEPTED in their entirety. 28 U.S.C. § 636(b)(1). The respective motions for an involuntary dismissal hereof of all the defendants, except the defendant Mr. Miller, hereby are GRANTED, and this action hereby is DISMISSED as to the defendants SSS Bonding Company, Inc., Messrs. Harry Story and Danny B. Story and Ms. Margaret Story. Such motion as to the defendant Mr. Ron Miller hereby is

OVERRULED.

## ON THE MERITS [1]

This is an action by the plaintiff Miss Deborah Krueger, a citizen of the United States, for compensatory and punitive damages upon her claim that the defendant Mr. Ron Miller, under color of Tennessee law, subjected her to the deprivation of her federal immunity against unreasonable seizure and interference with her liberty, Constitution, Fourth and Fourteenth Amendments. 42 U.S.C. § 1983.[2] This Court has jurisdiction of the subject matter, 28 U.S.C. § 1343(3),[3] and of the parties. There was a bench trial herein on January 5, 1978.

Miss Krueger is a Texan. Her parents experienced marital difficulties, and on occasions she resided in Johnson City, Tennessee where other of her relatives reside. She was 18 years of age at the time with which we are concerned and evinces certain femi-

---

* With his aforementioned objection to the magistrate's recommendation regarding him herein, Mr. Miller submitted his affidavit consisting solely of a conclusion of law and asked the Court to treat his motion for a dismissal as one for a summary judgment and to dispose thereof as provided in Rule 56, Federal Rules of Civil Procedure. That matter outside the pleading presented to the Court was EXCLUDED. Rule 12(b), Federal Rules of Civil Procedure. The Court herein made a de novo determination of that portion of the recommendation of the magistrate specified by Mr. Miller. See 28 U.S.C. § 636(b)(1).

1. Because of the multiple facets involved herein, it is preferable to state the Court's findings of fact and conclusions of law in narrative form. Rule 52(a), Federal Rules of Civil Procedure.

2. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects * * * any citizen of the United States * * * to the deprivation of any * * * immunities secured by the Constitution * * * shall be liable to the party injured in an action at law. * * *" 42 U.S.C. § 1983.

3. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * * * * *

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage of any * * * immunity secured by the Constitution of the United States. * * *" 28 U.S.C. § 1343(3). The defendant claims this Court is without jurisdiction thereunder because no action of his herein was " * * * under color of any State law. * * *"

nine appeal. She was employed as a waitress in a fast-food facility.

While she was on this duty on Thursday, January 20, 1977[4] at about 8:00 o'clock, p. m., 7 warrants of arrest of the state of Tennessee were served upon her by deputies of the sheriff of Washington County, Tennessee, charging her with drawing unlawfully 7 checks on her bank account without sufficient funds. T.C.A. §§ 39–1959, 39–1965. Each of these warrants was issued by the defendant Mr. Miller, in his capacity as an elected justice of the peace[5] of such county, on the respective affidavits of Mr. John S. Willis, the operator of an establishment for the sale of package-beer and grocery items.

To obtain her enlargement on bond as to these charges, Miss Krueger applied to a private bonding company[6] to provide her bail. She appeared personally before Mr. Miller, this time in his capacity as an elected notary public of such county, and made oath and qualified as a party to certain documents included in this surety transaction in which she pledged her automobile as security for the bail provided her.

Soon thereafter, Miss Krueger and Mr. Miller were introduced socially in a bar and cafe where he was enjoying a drink of Scotch whiskey. Mr. Miller, a middle-aged man, interrogated the plaintiff in inquisitive detail concerning the identities of her friends locally, the place of her residence, and the identity of any person with whom she resided. He then turned the conversation to the subject of Miss Krueger's problems concerning the aforementioned checks, advising her that she had provided a topic of much conversation " * * * down at the sheriff's office * * *" and advised her she " * * * ought to get her a lawyer. * * *"

Miss Krueger assured Mr. Miller that she had not written the signatures on those checks, and that a quantity of her blank checks had been stolen from her. Nonetheless, Mr. Miller continued to return insistently to this subject, telling the plaintiff that all the sheriff's men believed her to be guilty, and that she should arm herself with the assistance of counsel. Miss Krueger was not overly impressed with Mr. Miller's "advice", and the parties soon parted company.

Some 31 hours after having first dealt with Miss Krueger, as a notary public while she was in custody and desired release on bail, on Saturday, January 22, at 3:00 o'clock in the morning, Mr. Miller, while impersonating a deputy sheriff, seized Miss Krueger in her house without a warrant, transported her in his private automobile to the local county jail, and caused her to be incarcerated therein the remainder of that Saturday, all the ensuing Sunday, and for a portion of the following Monday.

Magistrate Miller testified that, late the preceding afternoon, Mr. Willis had applied again to him to issue a warrant of the state of Tennessee against Miss Krueger in connection with an 8th check uttered at his establishment. He had taken no action at that time on that latest request. Mr. Miller testified he was told by Miss Krueger's bondsman afterward on the same Friday that he (the bondsman) had information that the plaintiff had arranged to surrender to some third party the possession of her previously hypothecated automobile, and might be preparing to flee this jurisdiction. He requested Mr. Miller to " * * * check and see if there's anything suspicious. * * *" Before beginning this investigation, Mr. Miller fortified himself with two drinks of Scotch whiskey and water.

While conducting a midnight-hour surveillance of the parking area of the apartment building in which the plaintiff resided,

---

**4.** All subsequent dates in the findings herein were in the year, 1977.

**5.** " * * * [J]ustices of the peace in their respective counties * * * are magistrates within the meaning of this title [T.C.A., title 38], and may require persons to * * * keep the peace in the manner provided in this chapter [T.C.A., title 38, ch. 3]." T.C.A. § 38–301.

**6.** Mr. Miller disavowed steadfastly any interest in, or connection with, any bonding company in his area.

Mr. Miller claims that he witnessed two or more persons engaged in packing luggage in Miss Krueger's automobile. He testified that this information caused him to suspect strongly that Miss Krueger just might be preparing to commit the public offense of jumping her bond, and it was his desire to investigate further inside her apartment. Thereupon, he rapped his knuckles upon the entrance-door of the living-quarters of this unmarried, 18-year-old girl in the darkest and quietest hours of night.

Inside that apartment, Miss Krueger was being visited at this time by two young male friends. In this semi-party atmosphere, when the knock was heard upon her door, Miss Krueger shouted "* * * come on in. * * *" Mr. Miller entered, sat-down in a convenient rocking-chair, and rocked silently.

In due course, Miss Krueger inquired the reason for this unexpected pleasure of Mr. Miller's company, and he responded testily: "* * * You know exactly what I'm doing here. * * *" Mr. Miller then resumed the topic of his earlier conversation with Miss Krueger regarding her still-extant problems with reference to the aforementioned checks.

He admonished her to admit she had written the bad checks, reporting that all the sheriff's men were certain that she had. As Miss Krueger continued to maintain her innocence of any wrongdoing, reiterated the previous information about her checks' having been stolen, and repeated that the signatures thereon were not hers, Mr. Miller appeared to her to grow angry and informed Miss Krueger that "* * * the NCIC[7] has a 'hit' on you about writing checks and jumping bonds. * * *"

Miss Krueger professed ignorance of "the NCIC", so Mr. Miller elaborated and explained that, through this records-service to law officers locally, they had been informed that she "* * * was running a check-writing organization. * * *" Again, the plaintiff denied any complicity in any illegal activity, reexplained how her blank checks had been stolen, signed by someone else, and uttered, and rejected all suggestion that she was "the ringleader" of any organized check-writing ring.

With this, Mr. Miller arose from the chair in which he was seated, approached the plaintiff, directed her to "* * * dress, * * *" and announced he would take her to jail. Miss Krueger announced in reply that, except for her earlier contact with him as a notary public, she did not know who Mr. Miller was.

Responsively, Mr. Miller reached his hand into his pocket, withdrew therefrom a black folder, displayed to Miss Krueger an attached metal badge[8] bearing the inscription, "DEPUTY SHERIFF",[9] and both asked and stated angrily: "Now, do you know who [sic] you're talking to? Get your clothes on; you're going to jail!"[10]

As the parties proceeded toward the county jail, Miss Krueger smelled the odor of alcohol on Mr. Miller's breath. He continued and intensified his accusations of her, admonishing her again at one juncture that she would "* * * be better-off to tell the truth * * *" about signing the bad checks. As Miss Krueger undertook patiently to reassert her truthfulness and her reason for claiming innocence of any

7. Presumably, this reference was to the National Crime Information Center service to the nation's law-enforcement officers. (Mr. Miller was then a member of the law enforcement committee of the Quarterly County Court of Washington County, Tennessee.)

8. Badges, identical to the one described by Miss Krueger, were, and are, available for public purchase in this area; indeed, some were purchased by the sheriff of that county and utilized temporarily by his deputies early in his present term of office.

9. It is undisputed that Mr. Miller was not at any pertinent time a deputy sheriff of any county or other political subdivision anywhere.

10. Mr. Miller contradicted pointedly all the testimony of Miss Krueger contained in this sentence. On rebuttal thereafter, Mr. Mark McCrary an eyewitness, testified that he saw Mr. Miller remove from his pocket a folder and exhibit it to Miss Krueger, but that from his vantage point he could not have seen a badge or, of course, any inscription upon it.

criminal culpability, Magistrate Miller exhibited again his anger and threatened to fix the plaintiff's bail-bond at $10,000—" * * * so high[11] you won't be able to get out until after your trial. * * * " After the parties arrived at the jail and Magistrate Miller had used the telephone, Miss Krueger inquired plaintively of Mr. Miller why he was " * * * doing this to me? * * * " His unresponsive answer to her was the angry warning: " * * * You open your big mouth one more time, and you'll get your bond raised to $15,000.[12] * * * "

Magistrate Miller had summoned Mr. Willis to the jail by telephone and had awakened an assistant district attorney general of that circuit from a deep sleep, presenting her over the same medium with a hypothetical factual situation and inquiring of her which criminal charge was appropriate to it. When Mr. Willis arrived, Magistrate Miller issued a warrant of the state of Tennessee charging Miss Krueger with having obtained money under false pretenses, T.C.A. § 39–1901. (See stipulations herein.) Miss Krueger appeared in the General Sessions Court of Washington County, Tennessee on Monday, January 24, at which time the warrant charging her with thus obtaining money was dismissed without prosecution on motion of the district attorney general of the circuit.

■ Mr. Miller defends his actions on the ground, *inter alia*, that, as a judicial officer, he is immune from suit herein. As to his functions as a justice of the peace in issuing the warrants of the state of Tennessee for the arrest of the plaintiff, and as to all his actions relating to fixing the amount of her bail, he is immune.

" * * * No immunity doctrine affecting persons is more strongly established than that of judicial immunity. * * * " *Kurz v. State of Michigan*, C.A. 6th (1977),

548 F.2d 172, 174[2]. " * * * [J]udicial officers are immune from suit under 42 U.S.C.A. § 1983. * * * " *Andrews v. Murphy*, C.A. 6th (1965), 349 F.2d 114, 116[2]. Justices of the peace are " * * * not liable under the Civil Rights statutes because of the principle of judicial immunity. * * * " *Hurlburt v. Graham*, C.A.6th (1963), 323 F.2d 723, 725[4], citing *Kenney v. Fox*, C.A. 6th (1956), 232 F.2d 288, certiorari denied (1956), 352 U.S. 855, 856, 77 S.Ct. 84, 1 L.Ed.2d 66.

■ As to the actions of Magistrate Miller, therefore, none is taken into consideration in this decision. However, as to all other matters involving the defendant's conduct, such did not take place in Mr. Miller's discharge of his official duties as a justice of the peace, and as to that conduct only, judicial immunity does not attach. *Kurz v. State of Michigan, supra,* 548 F.2d at 174 [2].

Mr. Miller defends his gross conduct further on the ground, *inter alia*, that at the pertinent times he was not acting under color of Tennessee law. He contends that, because his actions were not taken against Miss Krueger under color of Tennessee law, a necessary element of the provisions of 28 U.S.C. § 1343(3), *supra*, is absent, so that this Court lacks jurisdiction of the subject matter hereof.

The resolution of this question is reduced basically to the proposition of whether (a) Mr. Miller's nonmagisterial conduct was merely private, or (b) represents a misuse of power possessed by him by virtue of Tennessee law *and* its misuse was made possible only because Mr. Miller was clothed with the authority of Tennessee law. In the latter event, his action was taken "under color of" Tennessee law. *United States v. Classic* (1941), 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, 1383 (headnote 19).

---

11. Magistrate Miller testified that it was his policy to " * * * set pretty high bonds. * * * " He conceded, in response to a question by the Court, that he recognized the federal constitutional prohibition against excessive bail. See Constitution, Eighth Amendment.

12. Magistrate Miller did fix bond on the new (9th) charge against Miss Krueger at $15,000; however, on advice of an assistant district attorney general, Magistrate Miller ultimately reduced it.

The provisions of 42 U.S.C. § 1983 have their genesis in the Constitution, Fourteenth Amendment, § 1.[13] " * * * [T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such as may fairly be said to be that of the States [or their instrumentalities]. That amendment erects no shield against merely private conduct, however * * * wrongful. [Footnote reference omitted.] * * *" *Shelley v. Kraemer* (1948), 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 3 A.L.R.2d 441, 460 (headnote 4), cited and quoted from in *District of Columbia v. Carter* (1973), 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613, 620 [9].

Joined together the three episodes of interpersonal contact between the parties, before Mr. Miller misused the power possessed by him by virtue of Tennessee law, constituted in seriatim state action. But, in the abuse or misuse of his respective powers as a state official during the third of those incidents, a different concept is applicable.

(1) As found factually, *supra*, the initial contact of the parties was related to Mr. Miller's exercise of power as a notary public of this state possessed by him by virtue of Tennessee law. All that ensued, including the defendant's misuse or abuse of such power, was made possible only because Notary Public Miller was clothed as such with the authority of Tennessee.

(2) As also found factually, *supra*, Notary Public Miller translated the results of his early official contact with Miss Krueger into what began as a social occasion at a later time.

(3) As finally (for these purposes) found factually, *supra*, Notary Public Miller utilized his earlier official action, as thus translated during a social contact, as the basis upon which to renew his association with Miss Krueger within the confines of her place of residence, where the misuse of his power as a notary public occurred.

It was an unlawful act for Mr. Miller to abuse or misuse the power he had been given by the state of Tennessee and its instrumentality as a notary public. *Cf. Kerr v. City of Chicago*, C.A. 7th (1970), 424 F.2d 1134, 1140 [13], certiorari denied (1971), 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64. Tennessee requires the justices of the peace of its counties to elect as many notaries public for their counties as they deem necessary. T.C.A. § 8–1601. Each notary public thus elected is an officer of the state of Tennessee, T.C.A. § 8–1806; *Cason v. Cason* (1905), 116 Tenn. 173, 193(2), 93 S.W. 89, commissioned by its governor, T.C.A. § 8–1602, with power to administer oaths and qualify parties to affidavits, T.C.A. § 8–1620. Thus, Mr. Miller possessed, by virtue of Tennessee law, the power to administer the oath to Miss Krueger and qualify her as a party to her affidavit with her bonding concern; he was not possessed of the power as such official of official arrest. But, because he was possessed by virtue, and was clothed with all the authority of Tennessee law, as one of its notaries public, this made it possible for him to misuse or abuse that power in his conduct toward Miss Krueger.

The situation herein is not unlike that in *Henry v. Cagle*, C.A. 6th (1973), 482 F.2d 137, which originated in this district. Therein, Mr. Cagle possessed the power of one of its constables by virtue of Tennessee law. Mr. Henry's father had shot at Mr. Cagle's son during an election dispute. The two Messrs. Cagle then sought-out Mr. Henry, locating him in the custody for questioning of two deputies sheriff after an election-night argument. It was possible for Mr. Cagle to "get-at" Mr. Henry in that situation, because Mr. Cagle was clothed with the authority of Tennessee law as one of its constables. After Mr. Cagle had consciously or unconsciously used his official position as constable under Tennessee law

13. " * * * No State shall * * * enforce any law which shall abridge the * * * immunities of citizens of the United States; nor shall any State deprive any person of * * * liberty * * * without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Constitution, Fourteenth Amendment, § 1.

to "get-at" Mr. Henry, Mr. Cagle committed an wholly unofficial assault upon Mr. Henry. Under the concept of the reason Mr. Cagle was able to approach Mr. Henry for nefarious private purposes, our Court of Appeals found Mr. Cagle's actions to have been under color of Tennessee law.

Analogous to *Cagle, supra,* Mr. Miller possessed the power by virtue of Tennessee law as one of its notaries public. It was possible for him to "get-at" Miss Krueger in this situation, because he was clothed with the authority of Tennessee law as one of its notaries. After Mr. Miller had consciously or unconsciously used his official position as a notary public under Tennessee law to "get-at" Miss Krueger, Mr. Miller deprived her of her constitutional immunity in an wholly unofficial manner.

Having "gotten-at" Miss Krueger in the foregoing manner, Notary Public Miller took a different tack; he pretended to possess the power by virtue of Tennessee law of one of its deputies sheriff, and he misused this pretended power to cause the plaintiff to submit to his pretended-official custody. Such misuse of power was made possible only because Mr. Miller claimed to be clothed with the authority of Tennessee law.

The Supreme Court expanded its explanation, in *Classic, supra,* of the meaning of the statutory term, under color of State law, when it said:

\* \* \* \* \* \*

\* \* \* It is clear that under "color" of law means under "pretense" of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If \* \* \* the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea. \* \* \*

*Screws v. United States* (1945), 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495, 1508. The Seventh Circuit, with certiorari denied,

took this to mean that "\* \* \* acts are also done 'under color of law' when state officials act outside the limits of their lawful authority while pretending to act in the performance of their official duties; that is to say, it is an unlawful act for an official to abuse or misuse the power he has been given as an official. \* \* \*" *Kerr v. City of Chicago, supra,* 424 F.2d at 1140[13].

It is emphasized that the defendant was possessed doubly by virtue of Tennessee law of powers, *i. e.* (1) powers as a justice of the peace, and (2) powers as a notary public. Magistrate and Notary Public Miller acted outside the limits of his lawful authority both as (1) a justice of the peace and (2) a notary public, when he pretended to possess also, by virtue of Tennessee law, the powers of a deputy sheriff. In so doing, he committed the unlawful act of impersonating a law-enforcement official of this state, by doing an act which could only have been done by a law-enforcement official exercising his power outside the bounds of his lawful authority as a deputy sheriff. *Idem.*

For all these reasons, this Court hereby FINDS that the defendant Mr. Miller did the foregoing acts under color of the law of Tennessee.

That Mr. Miller deprived Miss Krueger of her immunity against unreasonable seizure cannot be doubted. "The right of the people to be secure in their persons \* \* \* [and] \* \* \* houses \* \* \* against unreasonable searches and seizures, shall not be violated. \* \* \*" Constitution, Fourth Amendment. "Seizure", as used in the federal Constitution, implies, *inter alia*, the taking by lawful authority of a person. *Monroe v. Pape*, D.C.Ill.(1963), 221 F.Supp. 635, 642[3]. "\* \* \* [T]he guarantee against unreasonable \* \* \* seizures contained in the Fourth Amendment has been made applicable to the \* \* \* [state of Tennessee] \* \* \* by reason of the Due Process Clause of the Fourteenth Amendment. \* \* \*" *Monroe v. Pape* (1961), 365 U.S. 167, 171, 81 S.Ct. 473, 476, 5 L.Ed.2d 492, 496 (headnote 2).

Mr. Miller claims that he possessed power under the provisions of T.C.A. § 40–816 as a private citizen to arrest Miss Krueger on his reasonable belief that she was *about* to commit the *felony* of bail-jumping, T.C.A. §§ 39–3813, 39–3814, and that, accordingly, he is entitled to the defense of good faith and reasonable action. This defense involves two considerations: first, whether subjectively, Mr. Miller was acting "sincerely" and with a belief that he was doing right, and secondly, whether, objectively, Mr. Miller acted "with such disregard of the [plaintiff's] clearly established constitutional rights that [his] action cannot reasonably be characterized as being in good faith. * * *" *Wolfel v. Sanborn*, C.A.6th (1977), 555 F.2d 583, 592[2].

■ Mr. Miller's seizure as a citizen of Miss Krueger without a warrant was unauthorized, unless a felony *had* been committed by someone, and Mr. Miller had reasonable cause to believe that Miss Krueger had *committed* it. *Henry v. United States* (1959), 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134. This federal rule is echoed in the language of the apposite Tennessee statute allowing arrests by private persons, i. e. : " * * * a private person may arrest another: * * * (3) when a felony has been committed, and he [the private person] has reasonable cause to believe that the person arrested committed it. * * *" T.C.A. § 40–816, *supra.*

■ Under the federal Constitution, Fourth Amendment, Mr. Miller's suspicion that Miss Krueger might be about *to* commit a felony was not enough reasonable cause for his seizing her. *Henry v. United States, supra*, 361 U.S. at 104, 80 S.Ct. at 172, 4 L.Ed.2d at 139 (headnote 13). Even his " * * * strong reason to suspect * * *" that she was about to violate Tennessee law was inadequate to provide Mr. Miller with reasonable cause to believe that a felony had been committed, and that

she had committed it. " * * * 'Arrest on mere suspicion collides violently with the basic human right of liberty.' * * *" *Ibid.*, 361 U.S. at 101–102, 80 S.Ct. at 170–71, 4 L.Ed.2d at 138 (headnote 2).

Furthermore, in making this arrest presumptively as a private citizen, Mr. Miller was required by Tennessee statute to inform Miss Krueger " * * * at the time of the arrest * * * of the cause thereof. * * *" T.C.A. § 40–818. Mr. Miller did not do this; instead, upon reaching the jail, he exhibited to her " * * * a big, thick book * * *" and stated, " * * * we ought to be able to find something in here to charge you with. * * *"

Additionally, in undertaking to assert his defense of good faith and reasonable action under the provisions of T.C.A. § 40–816, there was no showing by Mr. Miller that a *felony* had been committed, even assuming that Miss Krueger had jumped bail, *viz.*: " * * * Any person who has been admitted to bail for appearance before any court of the state of Tennessee for any offense constituting a felony * * * who intentionally incurs a forfeiture of said bail and willfully leaves the state of Tennessee, shall be guilty of the offense of bail jumping. Any person found guilty of the offense of bail jumping, as defined in this section, shall be imprisoned in the penitentiary for a term of not less than one (1) year * * * [*i. e.*, a felony]." [14] T.C.A. § 39–3813. Neither was there evidence offered by Mr. Miller that Miss Krueger had left the state of Tennessee wilfully after intentionally incurring a forfeiture of her bail.

■ In any event, the Court hereby FINDS objectively that Mr. Miller acted with such disregard of Miss Krueger's clearly established constitutional immunity against unreasonable seizure that his action herein cannot be characterized reasonably as being in good faith. Reminiscent of the pre-American Revolutionary days of this

14. Conversely, any person admitted to bail for appearance before any court of Tennessee for an offense constituting a misdemeanor who intentionally incurs a forfeiture of said bail and wilfully leaves the state of Tennessee,

" * * * shall be subject to a fine of not more than fifty dollars ($50.00) or confined in the county workhouse for a term of not more than one (1) year, or both * * * [*i. e.*, a misdemeanor]:" T.C.A. § 39–3814.

nation, Mr. Miller figuratively dragged Miss Krueger from the sanctity of her home in the dead of night without lawful authority and caused her to be locked-up in jail upon, as it developed afterward, a baseless accusation. He was a person professing workable knowledge of at least one Supreme Court decision as well as at least one portion of the United States Constitution. He was acquainted with the issuance of warrants of arrest and knew to consult legal authorities before moving against persons about to be accused of crime. He claimed knowledge of the authority of a justice of the peace of Tennessee to command another person to make an arrest, T.C.A. § 40–802.[15] Mr. Miller is not entitled herein to this defense.

■ Having been deprived of her federally-protected civil right, the plaintiff is entitled to damages for that constitutional violation. *Hostrop v. Bd. of Jr. College Dist. No. 515*, C.A.7th (1975), 523 F.2d 569, 579 [19], certiorari denied (1976), 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208. She is to be " * * * put * * * in the same position, so far as money can do it, as [s]he would have been had there been no injury * * *, that is, [this Court is] to compensate h[er] for the injury actually sustained. * * *" *Lee v. Southern Home Sites Corporation*, C.A.5th (1970), 429 F.2d 290, 293 [1, 2].

" * * * [T]he amount of damages for such an injury cannot be determined by reference to an objective standard * * *, [but] * * * the non-punitive damages to be awarded may be special, in the sense that they are related to the particular mental distress or other injury to the plaintiff, and general, in the sense that the damages are inherent in the nature of the wrong. Thus the factors which * * * should [be] consider[ed] in making the award * * *

include the nature of the constitutional deprivation and the magnitude of the mental distress and humiliation suffered by the plaintiff, as well as any other injury caused as a result of [her having been] deprived of federally protected rights. * * *" *Hostrop v. Bd. of Jr. College Dist. No. 515, supra*, 523 F.2d at 579–580 [19, 20].

Miss Krueger paid a premium of $50 to the bondsman for her appearance bond. She incurred an expense of approximately $200 for long distance telephone tolls between Johnson City and San Antonio, Texas in connection with her deprivation. She missed two full days of earnings in her work, although, when she re-reported for duty on Monday, January 22, she found she had been discharged from her employment prior thereto.[16]

She claimed she departed Johnson City partly because of the problems her parents were having and partly because she " * * * was afraid he [Mr. Miller] would hurt me. * * *"

While the amount of out-of-pocket damages suffered by Miss Krueger were not shown to be great, she sustained both special and general damages. The nature of Mr. Miller's unwarranted intrusion into Miss Krueger's home and life was outrageous.

■ The Constitution of the United States " * * * protects people * * *" in what [they] seek " * * * to preserve as private * * * against unreasonable * * * seizures. * * *" *Katz v. United States* (1967), 389 U.S. 347, 351–352, 353, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576, 582 [4], [7], 583. Wherever Miss Krueger was, she was " * * * entitled to know that [she would] remain free from unreasonable * * * seizure. * * *" *Ibid.*, 389 U.S. at 359, 88 S.Ct. at 515, 19 L.Ed.(2d) at 586 [22]. Miss Krueger was in her private home, and

---

**15.** " * * * When a public offense is committed in the presence of a magistrate, he may, by verbal or written order, command any person to arrest the offender, and thereupon proceed as if he had been brought before him on a warrant of arrest." T.C.A. § 40–802. Mr. Miller considered, and then apparently discarded, the interpretation that this statute enabled a justice of the peace to eschew such appointment and make the arrest personally.

**16.** That termination of her employment appears to have resulted proximately from her being arrested previously while on duty on Thursday, January 20.

this guarantee of protection against unreasonable seizure in her home "* * * marks the right of privacy as one of the unique values of our civilization. * * * " *McDonald v. United States* (1948), 335 U.S. 451, 453, 69 S.Ct. 191, 192, 93 L.Ed. 153, 157.

 Mr. Miller deprived Miss Krueger of her valuable immunity; he invaded her privacy in her own house and seized (albeit, not physically) her person. Although he acted under color of Tennessee law, he was no law-enforcement official armed with either a search warrant or a warrant for her arrest; all he had as a predicate for seizing her was a strong suspicion that she might be preparing to flee.

This loss by the plaintiff of a sense of protection by dint of the law was one motivating factor in her feeling compelled to return to a less-hostile and more-secure environment; small wonder, in the light of Mr. Miller's conduct, that she feared he might return to do her further harm. This facet of her damages [17] was inherent in the nature of Mr. Miller's constitutional deprivation.

From all which, the Court hereby AWARDS the plaintiff compensatory damages against the defendant of five-thousand, two-hundred, fifty dollars ($5,250).

 The Court, as the trier-of-the-facts herein, must decide in its discretion whether punitive damages should also be awarded to the plaintiff. *Gill v. Manual,* C.A.9th (1973), 488 F.2d 799, 801, citing and quoting from *Lee v. Southern Home Sites Corporation, supra,* 429 F.2d at 294[5]. A finding that Mr. Miller's conduct was malicious would entitle Miss Krueger to such an award, *Shannon v. Lester,* C.A.6th (1975), 519 F.2d 76, 81[6], as would a finding of some type of discriminatory motivation on his part. *Curry v. Gillette,* C.A.6th (1972), 461 F.2d 1003, 1005, certiorari denied (1972), 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492.

It is difficult to ascertain clearly whether Mr. Miller generated any personal animosity toward Miss Krueger in the course of their interpersonal involvements. Obviously, "* * * a showing of *personal* [in original] animosity or involvement between the parties may present a stronger case for the awarding of punitive damages, * * * " but it is not "* * * prerequisite to * * * the granting of such damages. * * * " *Gill v. Manual, supra,* 488 F.(2d) at 801 [1].

The prevalant federal rule now seems to be that the allowance of punitive damages in civil rights cases "* * * inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent, * * * " *Lee v. Southern Home Sites Corporation, supra,* quoted from in *Gill v. Manual, supra,* and that such an award is uniformly appropriate when the facts are such that the conduct of the defendant can be said to have been wilful and malicious apart from any showing of personal animosity between the parties, *ibid.,* 488 F.2d at 801 [2].

 As earlier found hereinabove, Mr. Miller's conduct toward Miss Krueger was in such disregard of her clearly established constitutional rights that it must be characterized reasonably as having been in bad faith, *supra.* It, thus, may also be characterized as having been wilful. As also found, Mr. Miller was a sophisticated person who, for whatever end-purposes, undertook unjustifiably to "throw-around" the official weight he possessed, and pretended to possess, as he insinuated himself into the life and home of this young woman and deprived her of her due protection in infringement of one of the most valuable of civilized assurances. It is easy for the Court to FIND that conduct to have been "malicious".

This Court is of the unequivocal opinion that wisdom dictates an award of punitive damages for that wilful and malicious conduct herein, not only as a form of pecuniary punishment of Mr. Miller, but, of equal importance, as a deterrent to others who would utilize their official positions to in-

---

17. As the Court excluded the defendant's offer of evidence as to any prior arrests of Miss

Krueger, the Court assesses no special damages related to her resulting mental distress.

timidate the unwary. From all which, the Court hereby AWARDS the plaintiff punitive damages against the defendant of one-thousand, two-hundred, fifty dollars ($1,250).

Furthermore, in its discretion, this Court hereby ALLOWS the plaintiff, as the prevailing party herein, a reasonable attorney's fee as a part of the costs herein. 42 U.S.C. § 1988, as amended Oct. 19, 1976 by Pub.L. 94–559, 90 Stat. 2641.[18] The Court hereby FINDS from its knowledge of this action that a reasonable attorney's fee for service herein to the plaintiff exceeds an amount of $1,875, and allows therefor, as a part of the costs to the plaintiff, the amount of $1,875.

In summary, it is the decision of this Court that the plaintiff Miss Deborah Krueger have and recover of the defendant Mr. Ron Miller herein compensatory damages of $5,250, punitive damages of $1,250, and the costs of her action, including as a part thereof, $1,875 as a reasonable attorney's fee. Rule 58(1), Federal Rules of Civil Procedure.

See also, D.C., 489 F.Supp. 354.

18. " * * * In any action * * * to enforce a provision of * * * section * * * 1983 * * * of this title [42], * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.