James Oliver McALESTER et ux.,
Plaintiffs-Appellants,

v.

David H. BROWN, Defendant-Appellee.

No. 72–2480

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Dec. 5, 1972.

Eric Weisberg, Denison, Tex., for plaintiffs-appellants.

Joe A. Keith, Sherman, Tex., Charles H. Gullett, Denison, Tex., Ralph Elliott, Sherman, Tex., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal from the granting of a motion to dismiss an action brought by plaintiffs-appellants, James Oliver McAlester and Ollie Mae McAlester, against defendant-appellee, Texas District Judge David H. Brown. The dispositive issue is whether on the instant

---

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, 5 Cir. 1970, 431 F.2d 409, Part I.

allegations a suit brought under 42 U.S. C. § 1983 is barred by the doctrine of judicial immunity as enunciated in Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. The court below dismissed the action when it ruled (1) that at the time the operative facts occurred, Judge Brown was acting "within his judicial jurisdiction," and (2) that immunity thus attached. We are in complete agreement with both rulings and we affirm.

Although appellee sharply disputes several of appellants' allegations, the parties are in basic agreement regarding the central facts. It is hornbook law, however, that our function when reviewing the dismissal of a complaint on little more than the pleadings is to determine whether the allegations of the plaintiff, if taken as true, will support an action. Accordingly, we treat this appeal as resting on the facts pleaded by appellants.[1]

Appellants allege that on the morning of August 31, 1970, they went to the Grayson County Courthouse in Sherman, Texas. They understood that their son was to stand trial on criminal charges that morning before appellee, who was Judge of the 59th District Court for Grayson and Collin Counties, Texas, and they intended to bring their son fresh clothing to wear to court. Their original complaint alleges that

"While at the Courthouse they went to the office of [Judge Brown] to learn when the trial would start. However, when Mr. Brown learned why they had come to his office, he lost his temper and told the McAlesters to get out or he would have them thrown in

jail. The old couple became confused and frightened and didn't move quickly enough for Mr. Brown, so, Mr. Brown left to get a deputy sheriff.

"As the McAlesters left Mr. Brown's office and were preparing to [depart] the Defendant returned with a deputy sheriff, and ordered the deputy to arrest Mr. McAlester and carry him to jail, which the deputy did. There he was mugged and fingerprinted and locked in a cell where he was kept until approximately 4:00 P. M. that evening, when he was finally released under orders of the Defendant."

Although Mr. McAlester was incarcerated for most of the day on August 31, 1970, a formal order adjudging him in contempt of court, nunc pro tunc, was not entered until October 20, 1971. At that time Judge Brown formally assessed as punishment for the contempt the time spent in jail by Mr. McAlester on August 31, 1970.

The central thesis of appellants' complaint is that only a minor misunderstanding occurred during their conversation with appellee, whereupon appellee overreacted and improperly exercised an autocratic, elephant-gun power to relieve his personal, non-judicial annoyance with a mosquito-sized problem. Appellants insist that they are without fault, that Mr. McAlester took no part whatsoever in the conversation, that any lack of haste in departing the judge's chambers was caused by old age and Mr. McAlester's deafness, and that the entire blame for the heat generated by the misunderstanding is attributable to Judge Brown's allegedly disagreeable

1. Because the court below had before it other documents in addition to the barebones pleadings, there is some confusion as to whether the dismissal order was really more in the nature of a summary judgment. It is unnecessary for us to resolve that question, however, for we find that the result here would be the same regardless of whether the case is viewed as an appeal from a summary judgment, *see* Adickes v. S. H. Kress &

Co., 1969, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, or as an appeal from a dismissal on the pleadings, *see* Radovich v. National Football League, 1957, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456. By treating the trial court's order as a dismissal, we assign appellants the lesser burden—they need only show that they can prevail if every fact they allege is taken as true.

disposition, testy character, and volatile temper.[2]

Based on the above version of the facts, appellants first brought a false imprisonment action in Texas state court. Appellants voluntarily dismissed that suit and filed the instant action in the United States District Court for the Eastern District of Texas. The federal suit primarily sought to recover damages for the "intentional deprivation of the Plaintiff's Constitutional right, as guaranteed by the Fourteenth Amendment, not to be deprived of liberty without due process of law." Additionally, appellants alleged pendent jurisdiction to hear the Texas common-law false imprisonment claim. See Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L. Ed. 1148.

■ Appellants recognize that Pierson v. Ray, supra, places a formidable roadblock in their path, and they seek to find a passable detour around it by making factual distinctions. In essence, appellants attempt to characterize the judge's behavior in their own case as falling without the broad borders of the immune area—acts committed within a judge's judicial jurisdiction. We are unable to accept that distinction and we hold that Judge Brown's action here fell squarely within the sheltered zone. We recognize that at the time of the altercation Judge Brown was not in his judge's robes, he was not in the courtroom itself, and he may well have violated state and/or federal procedural requirements regarding contempt citations. Nevertheless, we discern in this case four factors that, when taken together, compel the conclusion that Judge Brown was acting "in his judicial jurisdiction": (1) the precise act complained of, use of the contempt power, is a normal judicial function; (2) the events involved occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the confrontation arose directly and immedi-

ately out of a visit to the judge in his official capacity.

We do not mean to imply that we approve or condone a judge's use of his office to satisfy personal grievances, if that is what in fact occurred here. Nor do we suggest that our holding would be the same if this were a habeas corpus action. Rather, in this civil action we can only repeat the following language from the Supreme Court's opinion in Pierson v. Ray:

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences' . . . His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

"We do not believe that this settled principle of law was abolished by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that the immunity of legislators for acts within the legislative role

2. Among other specifics, they would support their claim by demonstrating that

Judge Brown gratuitously referred to Mr. McAlester as a "squirt."

was not abolished. The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine."

368 U.S. at 553–555, 87 S.Ct. at 1217–1218, 18 L.Ed.2d at 294–295 (emphasis added).

We also find that Texas grants its judges a similar immunity. The precise terminology differs slightly, but it is apparent that Texas judges are immune from damage claims arising out of "acts performed in the exercise of their judicial functions." *See, e. g.* Taylor v. Goodrich, 1897, 25 Tex.Civ.App. 109, 40 S.W. 515. Accordingly, we find that the allegedly pendent false imprisonment claim is similarly unmaintainable and that the entire claim was thus properly dismissed.

We note in concluding that the opening of any inroads weakening judicial immunity could have the gravest consequences to our system of justice. Every judicial act is done "under color of law;" absent the doctrine, every judicial error affecting a citizen's rights could thus ultimately subject the judge to section 1983 liability. To be sure, we can conjure converse chambers of horrors, but we cannot allow that to erode the necessary features of the immunity. That judicial immunity is sometimes used as an offensive dagger rather than a defensive shield must not justify derogating its inviolability. Even though there may be an occasional diabolical or venal judicial act, the independence of the judiciary must not be sacrificed one microscopic portion of a millimeter, lest the fears of section 1983 intrusions cow the judge from his duty.[3]

We have read and reread Justice Douglas' dissent to Pierson v. Ray, *supra*, and we too are mortified by the spectre of deprivations of the civil rights of our citizenry. But when the infringement comes at the hands of a judge, our system offers its own built-in corrective—the improprieties of judges may be attacked and appealed from, either directly or collaterally. Because the consequences would be so costly, the abolition of judicial immunity is not appropriate as an additional curative. A robe does not clothe a person with rectitude, but it *must* protect him from being subjected to liability at the behest of the disgruntled or the disgusted.

Affirmed.

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Herman P. UNGER, Jr., Defendant-Appellant.**

**No. 72–1149.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 17, 1972.

Decided Nov. 28, 1972.

Rehearing Denied Jan. 2, 1973.

---

3. Nine other justifications that have been advanced for the doctrine of absolute immunity are set out in Justice Douglas' dissent to Pierson v. Ray, *supra*, 386 U.S. at 564, 87 S.Ct. at 1222, 18 L.Ed.2d at 300, n. 4.

Harry J. Busch, Patrick A. Tuite, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, FAIRCHILD, Circuit Judge and GRANT, District Judge.*

DUFFY, Senior Circuit Judge.

Defendant-appellant is a licensed firearm dealer. He was tried before the court on a three-count indictment charging possession of unregistered firearms in two counts and a failure to keep registration records in the third count. Defendant was found guilty of the possession charge in Count-I [1] and was fined $500. Defendant appeals.

On December 20, 1970, pursuant to a search warrant, Chicago police detective Vollick and several other City police officers went to defendant's apartment located in Chicago, Illinois. Defendant Unger was present when the officers arrived and led the officers to the base-

---

* Chief Judge Robert A. Grant of the U. S. District Court for the Northern District of Indiana is sitting by designation.

1. Predicated on a statutory violation of 26 U.S.C. § 5861(d).

ment of his apartment. A number of weapons were discovered in a basement locker including machine guns, rifles, pistols, hand grenade casings, black powder, fuse assembly kits for hand grenades and M-2 conversion kits.

Daniel Harnett, a U. S. Treasury agent, testified that he heard an Assistant State's Attorney warn defendant of his constitutional rights. Later, when defendant was asked whether the M-2 conversion kits were registered defendant replied, "No, you've got me there".

At the trial, defendant moved for a judgment of acquittal without tendering any witnesses after the government had presented their evidence. The basis for this appeal is that the trial court erred in denying defendant's pre-trial motion to quash the search warrant. Therefore, questions concerning the constitutional requirements for obtaining a state search warrant are now before us.

The complaint for the warrant alleged that a private citizen, while working at his occupation, had occasion to be in the basement of an apartment building located on North Ashland Avenue, Chicago. In the course of his work, he observed an enclosed locker in the southeast corner of the basement. There was a small opening in the locker through which a cache of weapons was visible.

The citizen called the police, and based upon his experience with weapons gained while in the Ordnance section of the United States Army, he described the firearms and materials with particularity.

Thereafter, the citizen personally identified the building in question to the police and drew a diagram of the basement disclosing the exact location of the locker where the weapons were stored.

" . . . [C]omplainant . . . requests the issuance of a search warrant to search (the person of Herman Unger and locker in basement at 5424 and 26 N. Ashland, Chicago, Ill., location of locker S/E corner of basement, and seize the following instruments, articles and things: a cache of weapons including machine guns, machine guns with tripods, a rocket launcher, automatic and semi-automatic rifles, and ammunition for the above weapons, which have been used in the commission of, or which constitute evidence of the offense of Unlawful Use of Weapons and Failure to Register.

Complainant says that he has probable cause to believe, based on the following facts, that the above listed things to be seized are now located upon the (person and) premises set forth above: The complainant, [is] a police officer for the