**Jack R. HARPER, Plaintiff-Appellant,**

v.

**Arden Mays MERCKLE,
Defendant-Appellee.**

No. 79–2335.

United States Court of Appeals,
Fifth Circuit.
Unit B

March 5, 1981.

Rehearing Denied April 7, 1981.

Ted R. Manry, III, Charlie Luckie, Jr., Tampa, Fla., for plaintiff-appellant.

Barry A. Cohen, Richard G. Pippinger, John R. Parkhill, Tampa, Fla., for defendant-appellee.

Before HILL, KRAVITCH and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Plaintiff Jack R. Harper instituted this civil rights action against Judge Arden Mays Merckle, who was at the time of the alleged violations, a county judge in Hillsborough County, Florida. The case raises vexing problems concerning the scope of judicial immunity from suit under 42 U.S.C. § 1983 (1976). Holding that defendant is not entitled to assert absolute judicial immunity under the unusual facts of this case, and finding errors of law in the special interrogatories that the district court submitted to the jury, we reverse the judgment and remand the case for new trial.

## I. Facts and Procedural History

### A. Background

In 1970, plaintiff Jack R. Harper and Patricia F. Harper were divorced by order of the Circuit Court of the Tenth Judicial Circuit, Polk County, Florida. Effective July 2, 1974, that court officially closed its file in the divorce case and ordered plaintiff to tender future support payments directly to his former wife. Plaintiff, who had remarried and who resided in Boca Grande, Florida, travelled to Tampa on August 16, 1974 with his second wife to attend to various family matters. On that day, plaintiff went to the Hillsborough County Courthouse to leave a support payment check with his former wife, Patricia, a secretary employed by Judge Harry Coe of the Florida Circuit Court. Finding both doors to Judge Coe's chambers closed, plaintiff Harper entered an adjacent office where Barbara Bryant, secretary to defendant Judge Merckle, was seated behind a desk. Harper asked Miss Bryant whether she knew Mrs. Harper and where Mrs. Harper could be found. Miss Bryant responded that although Mrs. Harper had left work it might be possible to locate her. After Miss Bryant made several unsuccessful attempts to reach Mrs. Harper by phone, plaintiff explained the purpose of his visit, namely, to make a child support payment to his former wife. Knowing that she would see Mrs. Harper in the course of the weekend, Miss Bryant offered to deliver a check to Mrs. Harper on plaintiff's behalf. Although plaintiff was not certain exactly how much he owed his former wife, he approximated, wrote a check for $210.00, and gave it to Miss Bryant.

During most of this conversation Judge Merckle sat in his office. But during Harper's explanation of his debt, defendant—wearing street clothes, not judicial attire—entered the room, told Miss Bryant to retrieve the "Harper v. Harper" file from the Clerk's office, and as she left sat down in the seat his secretary had occupied. In sending for the file, Judge Merckle was attempting to verify what he later recog-

nized was a mistaken impression—ostensibly gleaned through courthouse gossip or his casual acquaintance with plaintiff's former wife—that the file contained an outstanding contempt violation against plaintiff.[1]

Judge Merckle then engaged plaintiff in small talk, which lasted until Miss Bryant called to say she could not locate the file. Judge Merckle told Miss Bryant to return to the office, ended the phone conversation, and turned his attention to the check Harper had written for child support. As he examined it, Judge Merckle asked Harper where he lived. Plaintiff directed the judge's attention to the address on the check and said he lived in Boca Grande, Florida. When defendant observed that the "address" on the check indicated only a post office box number, plaintiff explained that there are no street addresses or numbers in Boca Grande and that mail there is delivered only to a post office. Judge Merckle then asked Harper *exactly* where he lived; plaintiff was responsive, giving the name of his apartment complex, the number of his apartment, and a business card that contained address information identical to that on the check. Then, in what can be characterized fairly as a most unusual request, Judge Merckle, still seated behind his secretary's desk, told plaintiff to raise his right hand to be sworn in.

The subsequent occurrences are the subject of some factual dispute. Harper testified that he promptly walked out of the office into the hall passing Miss Bryant, who was returning from the Clerk's office. Judge Merckle, again according to plaintiff's testimony, pursued him into the hall, told Miss Bryant to locate a deputy, and attempted to grab hold of plaintiff. Harper told the judge, "Don't you dare touch me," and Judge Merckle did not. As defendant and his secretary looked for a deputy, Harper exited the building and attempted to find the nearby law office of a friend.

The defendant's testimony paints Harper as far more belligerent. Judge Merckle claimed that after he told Harper to raise his hand, Harper responded, " 'No mother fucker is going to swear me in,' "[2] and bolted from the office.

A chase scene ensued. Harper, whether he walked or ran from the courthouse, soon found he was being pursued by court bailiffs. He ducked into an office building in search of his attorney friend and proceeded to the second floor, only to be informed that his friend had relocated his office two weeks earlier. Harper then headed for the back stairs of the building, where he was trapped by the bailiffs. Plaintiff was then escorted to the front of the building by the bailiffs where he called out to bystanders, "Please, please, remember what's gong on." There, Harper testified, he was thrown against a fence and frisked in full view of

---

1. As a reason for his initial interference, Judge Merckle claimed that he was attempting to "*help*" plaintiff *as well as clear up some outstanding judicial business.* Defendant testified that there were

 some problems with Mr. Harper determining how much child support was owed, and I thought the Court file would reflect what was owed and also at the same time I believed there was some outstanding case against Mr. Harper for failure to pay a child support, and at which time he could have been served by another party, *that being the Sheriff,* and then that could have been presented to the proper court to determine whether or not he was in violation.

 Record, Vol. II, at 151. In other testimony Judge Merckle stated that "[a]nybody that walks in my judicial Chambers involves themselves with me because those are my Chambers

as a judge for the State of Florida . . . ." *Id.* at 181.

2. The transcript of Judge Merckle's "rump" hearing, *see* pp. 852–53 *infra,* contains no reference to Harper's alleged use of profanities as a basis for defendant's actions. At the time of the hearing, Judge Merckle's reason for finding Harper in contempt was "[b]ecause [he] disobeyed a Court rule." *Id.* at 853. But at the trial of this action Judge Merckle was quite clear on this point and even suggested that the language had made a deep impression upon him: "He [Harper] refused [to take an oath] and at the same time displayed vile, filthy, the most filthy language toward me I have ever witnessed." Record, Vol. II, at 163. In fact, Judge Merckle now claims that plaintiff's alleged use of profanity—a misdemeanor under Florida law—directed toward a judicial officer gave him jurisdiction over plaintiff.

the public.[3] The bailiffs then took Harper to Judge Merckle's office, where 10 or 15 people—besides Judge Merckle and a court reporter—awaited his arrival.

### B. *The Hearing*

At this point, in chambers, Judge Merckle began a "contempt proceeding" of sorts. The record of that "hearing," in which defendant acted as complaining witness, prosecutor, factfinder, and judge, follows in its entirety.

IN THE COUNTY COURT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

In re: No. 10747

Jack Harper—Contempt of Court: Div. "A"

\* \* \*

. . . . .

THE COURT: Let's go on the record. I would like to cite the facts.

MR. HARPER: I haven't been informed of my rights and I want an attorney. That's all I want.

THE COURT: Mr. Harper, just remain quiet just for a few minutes, please, sir.

All right, this is Friday, August 16, 1974. Mr. Harper came in my Chambers approximately, I'd say, three o'clock in the afternoon looking for Mrs. Pattie Harper or Judge Coe.

The purpose of coming in trying to find these two individuals was for Mr. Harper to pay some back child support I gather that he owed Mrs. Harper.

I tried to find Mr. Peaveyhouse, Mrs. Harper's attorney, to no avail. I also tried to check out the court file to assist Mr. Harper to find out what the delinquent child support was. Could not find the court file.

Because of not being able to find this, I told Mr. Harper the best thing to do would be just go ahead and leave the check, if he wanted to.

I did not know if this was the correct amount or not, but this is his own choosing and he wrote out the check and left a check for $210 made payable to Mrs. Pattie Harper, dated August 16.

I also asked Mr. Harper what his address was in Boca Grande, as I understood that there are various summons outstanding, trying to get him served for his contempt proceedings in the Circuit Court for failure to pay child support.

MR. HARPER: Which Circuit Court?

THE COURT: Just a minute, Mr. Harper, please, sir.

MR. HARPER: I haven't received anything from any court other than I was supposed to make my payments.

THE COURT: Mr. Harper, just remain quiet.

MR. HARPER: From Polk County directly to Pattie Harper.

THE BAILIFF: Do you understand what the Judge is saying?

THE COURT: Mr. Harper, please remain quiet.

MR. HARPER: I can't say anything?

THE COURT: In a few minutes.

I asked Mr. Harper his address and I thought it might be better to put him under oath to find out where he did reside, so justice could be done.

He stated to me he wasn't about to be sworn, he wasn't there to tell me anything.

MR. HARPER: I didn't say that—anything—

THE COURT: And if anyone proceeded to hurt him or try to take him into custody, which I told him I might have to do, he said that they are going to have to do it in force. And he got up—

---

**3.** For purposes of appeal, defendant has—with certain exceptions and amendments—concurred in plaintiff's factual summary. While defendant Merckle has not taken exception to Harper's facts concerning the scene that followed the bailiffs' successful apprehension of plaintiff, we do note that defendant's witness, Hillsborough County Deputy Sheriff James C. Evans, did testify that he and his co-bailiff did not throw plaintiff against any wall or fence. Record, Vol. II, at 284.

MR. HARPER: I did not say any force, either.

THE BAILIFF: Mr. Harper, please be quiet.

THE COURT: He got up and proceeded out. I told him to remain seated. He said he wasn't about to.

I sent my secretary for the Sheriff's Deputies and, as I understand it, from then on, that they had to give chase and in approximately fifteen or twenty minutes he has been brought back into my office.

MR. HARPER: Would you tell him exactly how you chased me?

THE COURT: Just a minute, Mr. Harper.

The whole basis of this hearing is whether or not you are in contempt of this Court for not remaining where you were.

The Court at this time does hold you in contempt so anything you care to say Mr. Harper, before the Court imposes any sentence on you?

All right sir.

MR. HARPER: Well, I said—I was sitting there. You said you wanted me to raise my hand. I said, "Why?" You said because you wanted to put me under oath. Exactly what you said. I said, "Why?" You said because you wanted to check my address.

You want to check my address, read my address. And then call Boca Grande. Boca Grande is only a city of two hundred, three hundred. You walk on the island, say, "Where is Jack Harper?" they are going to direct you to Jack Harper.

I am not trying to hide anything. I am in the real estate business down there. I am a registered real estate broker. I have a fishing business. I have a business in Lakeland. And I don't think it's too good, me to be roughed up, treated like I have been treated, after I make an effort, an effort to pay my ex-wife what she deservingly owes [sic] as the good Court granted her.

If you would like to read back what he said to me, I would be glad to object to what he said, if you listen, because they are not exactly—you assumed words. You haven't said exactly right, exactly what has happened.

THE COURT: Well, Mr. Harper, like I have stated, the Court has found you in contempt of court.

MR. HARPER: For what?

THE COURT: Mr. Harper, at this time, I am not going—

MR. HARPER: How can I be in contempt of court when I have paid my dues?

THE COURT: Just be quiet, please, sir.

MR. HARPER: I tell you, man, this is really crazy.

THE COURT: What I am going to do, sir, before the Court imposes sentence—in fact, I am not going to impose any sentence at this time.

Mr. Harper, can you be here Monday morning at nine o'clock?

MR. HARPER: No, I will be out of town.

THE COURT: All right, sir, then, I will put you in custody. You will be here. All right, sir.

MR. HARPER: For what?

THE COURT: Be back in this court—

THE BAILIFF: Contempt of Court.

THE COURT: Have him back in this court at that time, Monday morning at nine o'clock.

MR. HARPER: I will be here—wait a minute—wait a minute—wait a minute.

Now, why is all this happening?

THE COURT: Because you disobeyed a Court rule.

MR. HARPER: Where was the Court?

THE COURT: Just take him out, Mr. Pinegar.

MR. HARPER: Where is the Court? I want an attorney man.

(Hearing concluded at 3:50 p. m.)

Following the "hearing," Harper was placed in a small room to await transportation to jail. He testified that he was threatened during the wait by a man who raised a fist at him but did not strike him. Harper was

allowed to call his wife. He informed her of his predicament and asked that she contact an attorney. Fifteen minutes later Harper was placed in a paddy wagon and transported to the county jail, where he was to spend his weekend. At the jail, plaintiff was fingerprinted. His personal effects were inventoried. He was photographed and put into a 6 × 8 foot hot, noisy, jail cell equipped with a small, dim twenty-four hour light, a lavatory and a urinal. Conditions were, as Harper testified, squalid:

> They gave me about an inch thick foam-rubber pad to put on a piece of metal there in the jail so I could sleep on, but it smelled so bad that there's no way that I could possibly ever have laid on it.
>
> I in turn cut my pants off because it was so hot, and made shorts, and I must have killed several hundred roaches while I was in there. It was just, it was—the smell, it smelled with vomit and human waste in the cell . . . .

Record, Vol. II, at 58. Plaintiff further testified that his life was threatened, though he was not physically molested, by a prisoner peeved that Harper had no cigarettes. Efforts by Harper's attorney, directed to Judge Merckle, to obtain plaintiff's early release on bail were absolutely fruitless.[4]

On Monday morning, Harper was chained to about a dozen prisoners and loaded into a van. He was then paraded in shackles past his former wife, through the very hall where the incident occurred, and toward the courtroom. Soon he was brought before Judge Merckle, who postponed sentencing one week to accommodate plaintiff's attorneys and released Harper from custody. The following Monday plaintiff returned to Judge Merckle's courtroom and was sentenced to three days' incarceration with credit for time already spent in jail. He was, at that time, also served with a summons for a domestic relations hearing on the amount of his child support payments.[5] Harper's contempt conviction ultimately was reversed by a Florida state court on appeal.

### C. Procedural History

Harper filed his complaint on August 8, 1975 alleging with factual particularity a cause of action against Judge Merckle arising under 42 U.S.C. § 1983 (1976) for violation of Harper's constitutional rights. The complaint was based jurisdictionally on 28 U.S.C. § 1343 (1976) and demanded a judgment for damages and costs. After two recusals, the case came to rest in the hands of George C. Young, Chief Judge, U.S. District Court for the Middle District of Florida. Defendant's motion to dismiss based upon his alleged immunity from suit was denied on April 26, 1977. Following additional pleading and discovery, on March 26, 1979 the case went to trial, which culminated in a jury verdict on special interrogatories for Judge Merckle. The trial court entered judgment on the verdict and subsequently denied Harper's Fed.R.Civ.P. 59 motion for new trial. Harper noticed timely appeal from the entry of judgment and the denial of new trial.

### D. Special Interrogatories

During trial of this § 1983 action, defendant twice moved for directed verdict. The district court denied the first motion, made at the close of plaintiff's evidence, but with-

---

4. Defendant suggests in his brief that because Harper's counsel chose to present the bail release question to defendant, "Harper's continued confinement . . . [can be] attribut[ed] to . . . the choice of Harper's counsel." Brief for Appellee at 16 n. 6. This bold conclusion comprises an arrant *non sequitur*, so much so that we abort it at this early point in our decision. Had Harper's counsel sat idle, Harper, we can reasonably assume, would have spent his weekend in jail. Thus, counsel's approach to Judge Merckle on the bail issue hardly could be the cause of Harper's "continued confinement." Defendant seems to argue further along these lines that Harper's counsel should have presented the issue to another judge, who would have released Harper. This ostensibly concedes that a neutral and detached judge would have seen the error and/or illegality of Judge Merckle's acts and would have released plaintiff. In sum, we must concur in Harper's appraisal of defendant's argument on this score: "it is an affront to intelligence."

5. The eventual outcome of the domestic relations hearing was an increase in Harper's child support payments by five dollars per week.

held its ruling on the renewed motion, determining that the proper course was to submit special interrogatories [6] to the jury. The purpose of interrogatories 1–3, according to the district court, was "informational." Interrogatories 4–7 [7] were intended to determine whether plaintiff established a prima facie case. Merckle's defenses were embodied in interrogatories 8–9, and Har-per's damages were covered in interrogatories 10–11.

## II. *Absolute Judicial Immunity*

■ Defendant asserts that notwithstanding his failure to press the point at trial,[8] this Court should consider whether he is absolutely immune from suit because our cases mandate affirmance of a district court

6. The special interrogatories with jury responses noted in brackets, were as follows:

WE THE JURY find that the answers to the following interrogatories are as hereinafter stated:

1. Has the defendant, ARDEN MERCKLE, proved by a preponderance of the evidence that on August 16, 1974 in Judge Merckle's chambers the plaintiff, JACK HARPER, used profane language in addressing Judge Merckle when asked to be sworn for the purpose of obtaining Harper's residence address?
___[YES]___

2. Has the defendant, ARDEN MERCKLE, proved by a preponderance of the evidence that on August 16, 1974 the plaintiff, JACK HARPER, ran from and attempted to flee the two deputies who were assigned to return Harper to Merckle's chambers?
___[YES]___

3. Has the defendant, ARDEN MERCKLE, proved by a preponderance of the evidence, that on August 16, 1974 in the hearing held in Judge Merckle's chambers the plaintiff, JACK HARPER, was disruptive of the proceedings?
___[YES]___

4. Has the plaintiff, JACK HARPER, proved by a preponderance of the evidence that the defendant, ARDEN MERCKLE, confined or caused to be confined Jack Harper in the Hillsborough County Jail from August 16, 1974 until August 19, 1974?
___[YES]___

5. Has the plaintiff, JACK HARPER, proved by a preponderance of the evidence that the defendant, ARDEN MERCKLE intended to confine Jack Harper in the Hillsborough County Jail for the dates aforesaid at the time of such confinement?
___[YES]___

6. Has the plaintiff, JACK HARPER, proved by a preponderance of the evidence that his confinement was illegal, that is, without lawful authority for such incarceration?
___[NO]___

7. Has the plaintiff, JACK HARPER, proved by a preponderance of the evidence that he was aware of the confinement and suffered damages therefrom?
___[NO]___

If your answers to Interrogatories, 4, 5, 6 and 7 above were all "yes", then you would proceed to consider and answer Interrogatories 8 and 9; however, if your answer to any one of Interrog-atories 4, 5, 6 and 7 was "no", then you should *not* consider these Interrogatories any further but should return your verdict in open court.

8. Has the defendant, ARDEN MERCKLE, proved by a preponderance of the evidence that there was reasonable basis for Merckle's belief that the detention of Harper was lawful?
_____

9. Has the defendant, ARDEN MERCKLE, proved by a preponderance of the evidence that in causing the confinement of Harper, Merckle acted in good faith?
_____

If your answer to both of Interrogatories 8 and 9 was "yes", then you should *not* consider the following interrogatories, but should return your verdict in open court. If, however, your answer to either or both of Interrogatories 8 and 9 was "no", then you should proceed to consider and answer Interrogatories 10 and 11 below.

10. What, if any, is the amount of monetary compensatory damages the plaintiff, JACK HARPER, has proved by a preponderance of the evidence that he has suffered as a proximate cause of the actions of the defendant, ARDEN MERCKLE?
_____

11. What, if any, is the amount of punitive damages that the plaintiff, JACK HARPER, has proved by a preponderance of the evidence that he is entitled to receive from the defendant, ARDEN MERCKLE?
_____

SO SAY WE ALL.
___[s/by Foreman]___
DATED this [30] day of March, 1979.

7. The record reveals the considerable concern, agitation and ambivalence of court and counsel concerning interrogatories 4–7. Originally, the court proposed that only 4, 5 and 7 be submitted to the jury, but as its view of the elements of a prima facie case changed, the court included interrogatory 6, addressing the issue of unlawfulness.

8. Defendant did, however, clearly raise the affirmative defense of absolute judicial immunity in "Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint," filed June 15, 1977. Thus, the difficulties present in *Boyd v. Carroll*, 624 F.2d 730 (5th Cir. 1980) are not involved.

decision whose "result is correct . . . [al]though based upon an improper ground." *Stegmaier v. Trammell*, 597 F.2d 1027, 1038 (5th Cir. 1979). *See SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Raven v. Panama Canal Co.*, 583 F.2d 169 (5th Cir. 1978), *cert. denied*, 440 U.S. 980, 99 S.Ct. 1787, 60 L.Ed.2d 240 (1979). Judge Merckle's assertion is correct; accordingly, we consider the immunity question.

 Section 1 of the Civil Rights Act of 1871, 17 Stat. 13 (Apr. 20, 1871), presently 42 U.S.C. § 1983 (1976) under which plaintiff Harper proceeds, states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizens of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress.

We accept,[9] however, that "[e]very person," means "every person *except* judges," *Pierson v. Ray*, 386 U.S. 547, 559 87 S.Ct. 1213, 1220, 18 L.Ed.2d 288 (1967) (Douglas, J., dissenting), who generally have been accorded the unique treatment embodied in the term "absolute immunity." The cases establish "as a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."[10] *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871). To determine whether Judge Merckle indeed acted within the "outer perimeter," *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959), of "the authority vested in him," 80 U.S. (13 Wall.) at 347, we turn to the cases decided by the Supreme Court and our Court bearing upon this question.[11]

9. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) the Court determined that the record of Congressional proceedings that accompanied the passage of what is now 42 U.S.C. § 1983 (1976) "gives no clear indication that Congress meant to abolish wholesale all common-law immunities." 386 U.S. at 554, 87 S.Ct. at 1217. *But see* Kates, *Immunity of State Judges Under the Federal Civil Rights Acts*: Pierson v. Ray *Reconsidered*, 65 Nw.U.L. Rev. 615, 620–23 (1970); Note, *Liability of Judicial Officers Under Section 1983*, 79 Yale L.J. 322 *passim* (1969). Thus, we take as settled law the proposition that in the *vast* majority of § 1983 cases in which judges are named as defendants, judicial immunity will bar the action. Moreover, as our analysis *infra* at p. 859 & n.17 reveals, we can envision no situation —where a judge acts after he is approached *qua* judge by parties to a case—that could possibly spawn a successful § 1983 suit. In fact, we note that even a judge who is approached as a judge by a party for the purpose of conspiring to violate § 1983 is properly immune from a damage suit. *See Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir. 1979) (en banc), *aff'd sub nom. Dennis v. Sparks,* —— U.S. ——, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). *But cf. Rankin v. Howard,* 633 F.2d 844 (9th Cir. 1980).

10. Although ensuring the independence of the judiciary is a crucial policy basis supporting judicial immunity, it is but one of many such

policies. Others include: (1) need to avoid vexatious litigation against judges; and (2) need for an end to litigation. *See generally* King, *Judicial Immunity and Judicial Misconduct: A Proposal for Limited Liability*, 20 Ariz. L.Rev. 549, 579–88 (1978); Nagel, *Judicial Immunity and Sovereignty*, 6 Hast.Const.L.Q. 237, 239–60 (1978); McCormick & Kirkpatrick, *Immunities of State Officials Under Section 1983*, 8 Rutg.–Camd.L.J. 65, 69–73 (1976).

11. The modern history of judicial immunity properly is introduced with reference to *Floyd v. Barker*, 77 Eng.Rep. 1305 (Star Chamber 1607). In that case, Lord Coke based his argument for judicial immunity upon an institutional *sine qua non*, the need for an end to litigation: without the doctrine "there will never be an end of causes . . . [and] controversies will be infinite." *Id.* at 1306. The law of judicial immunity developed further with Lord Coke's decision in *The Case of the Marshalsea*, 77 Eng.Rep. 1027 (C.P.1610). There, he explored the characteristics and ramifications of an "act *coram non judice*," loosely interpreted as action by a court without jurisdiction to so act. These early insights still figure prominently in judicial analysis of the immunity issue, as much of the authority cited in this opinion demonstrates. Indeed, Lord Coke's impact is evident in James Kent's decision in *Yates v. Lansing*, 5 Johns. 282 (N.Y.Sup.Ct.1810), *aff'd* 9 Johns. 395 (N.Y.1811). *But cf.* Feinman & Co-

From the earliest days of our Republic to the present, only on five occasions has the Supreme Court addressed squarely the issue of judicial immunity.[12] Only the first case, *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1863), contains a hint of equivocation. There, plaintiff, an attorney, attempted to bring suit against the judge who disbarred him. Drawing heavily on English authority, Justice Field held the defendant judge immune from tortious liability. "Any other doctrine would necessarily lead to the degradation of the judicial authority and the destruction of its usefulness." *Id.* at 526. But in so holding, Justice Field also wrote that judicial immunity was to obtain "unless perhaps where the [judicial] acts, in excess of jurisdiction, are done *maliciously* or *corruptly*." *Id.* (emphasis added). Three years later in *Bradley v. Fisher, supra*, Justice Field dismissed his earlier language as *obiter dictum* and plugged the gap opened by the "malice" language of *Randall*.[13] In so doing he set the stage for the next century or so of consistent jurisprudential development in the area.

The most recent and authoritative pronouncement on this question is *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Plaintiff, Linda Kay Spitler Sparkman, sued Judge Stump under § 1983 in connection with his approval of an *ex parte* petition to have plaintiff sterilized. Sterilization had been sought by plaintiff's mother, who was concerned that her "somewhat retarded" daughter's occasional nocturnal association with "older youth or young men" might result in pregnancy. *Petition to Have Tubal Ligation Performed on Minor and Indemnity Agreement, reprinted in* 435 U.S. at 351 n. 1, 98 S.Ct. at 1102 n. 1. Plaintiff was not told the true purpose of the operation but was told she was to have an appendectomy. After she married, plaintiff's "inability to become pregnant led her to discover" "the true nature of her surgery." *Id.* at 353, 98 S.Ct. at 1103.

■ The Supreme Court held Judge Stump immune from suit under the civil rights statute. In the process, the Court cast aside considerable debris [14] that tended

hen, *Suing Judges: History and Theory*, 31 S.C. L.Rev. 201, 224-43 (1980).

12. *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Alzua v. Johnson*, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142 (1913); *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868). Only *Stump* and *Pierson* dealt with judicial immunity from suit under 42 U.S.C. § 1983 (1976). *Cf. Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

13. *See Bradley*, 80 U.S. (13 Wall.) at 351. That Justice Field was not detained by the "malice" language in *Randall* is evident in his discussion of that case in *Bradley*:

The qualifying words were inserted upon the suggestion that the previous language laid down the doctrine of judicial exemption from liability to civil actions in terms broader than was necessary for the case under consideration, and that if the language remained un-

qualified it would require an explanation of some apparently conflicting adjudications found in the reports. They were not intended as an expression of opinion that in the cases supposed such liability would exist, but to avoid the expression of a contrary doctrine.

In the present case we have looked into the authorities and are clear, from them as well as from the principle on which any exception is maintained, that the qualifying words used were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.

14. Here we refer to the Court's textual admonition that reviewing courts' visceral aversions to defendants' assertedly "judicial" actions amount to nothing in immunity analysis. "Disagreement with the action taken by the judge," wrote Justice White for the Court, "does not justify depriving that judge of his immunity." 435 U.S. at 363, 98 S.Ct. at 1108. Indeed, Justice Field recognized in 1871 that "[c]ontroversies involving . . . the liberty and character of the parties, and consequently exciting the deepest feeling" comprise precisely the "class of cases that the losing party feels most keenly

only to burden analysis such as this, and elucidated a cogent two-part test that—under the unusual and rare facts of this case—leads us to conclude that Judge Merckle *cannot* assert absolute judicial immunity. The Court extended the protection of judicial immunity to all "judicial acts" [15] unless those acts fall clearly outside the judge's subject matter jurisdiction. *Stump, supra,* 435 U.S. at 359–64, 98 S.Ct. at 1106–08. *Watson v. Interstate Fire & Cas. Co.,* 611 F.2d 120 (5th Cir. 1980); *see generally Williams v. Rhoden,* 629 F.2d 1099 at 1101 (5th Cir. 1980); *Turner v. Raynes,* 611 F.2d 92 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 269, 66 L.Ed.2d 129 (1980); *Henzel v. Gerstein,* 608 F.2d 654 (5th Cir. 1979); *Almon v. Sandlin,* 603 F.2d 503 (5th Cir. 1979); *Crowe v. Lucas,* 595 F.2d 985 (5th Cir. 1979); *Carmack v. Gibson,* 363 F.2d 862 (5th Cir. 1966). We must ask, then, (1) whether Judge Merckle's actions on August 16, 1974 were "judicial acts," and if so, (2) whether or not they fall clearly outside his jurisdiction [16] as a county judge in the State of Florida.

 What is or is not a "judicial act" is not wholly free from doubt. *See generally Crowe v. Lucas,* 595 F.2d 985, 990 (5th Cir. 1979); *Slavin v. Curry,* 574 F.2d 1256, 1263–64 (5th Cir.), *modified on other grounds,* 583 F.2d 779 (5th Cir. 1978), *overruled on other grounds, Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir. 1979)

(en banc), *aff'd sub nom. Dennis v. Sparks,* —— U.S. ——, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). *Stump* does reveal several characteristics of a "judicial act" drawn in part from our decision in *McAlester v. Brown,* 469 F.2d 1280 (5th Cir. 1972), which the Court cited approvingly. In *McAlester,* a Texas judge inexplicably lost his temper and jailed for contempt an elderly and somewhat deaf man, James O. McAlester. McAlester had come with his wife to deliver fresh clothing to their son who was incarcerated and due to stand trial before the defendant later that day. The judge in *McAlester* was held immune from suit under § 1983. For the Court, Judge Goldberg wrote that "four factors ... when taken together, compel the conclusion" that a judicial act was involved:

> (1) the precise act complained of, use of the contempt power, is a normal judicial function; (2) the events involved occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the confrontation arose directly and immediately out of a visit to the judge in his official capacity.

469 F.2d at 1282. Judge Merckle, in asking Harper to raise his right hand to be sworn in, and in later finding Harper in contempt, most assuredly was performing a "normal judicial function." And Judge Merckle's

---

the decision against him, and most readily accepts anything but the soundness of the [judge's] decision ...." *Bradley v. Fisher, supra,* 80 U.S. (13 Wall.) at 348.

A second shibboleth buried by the Court in *Stump* is the notion, erroneously regarded as significant by the Seventh Circuit in its consideration of the case, *see Sparkman v. McFarlin,* 552 F.2d 172, 174 (7th Cir. 1977), that a judge's "failure to comply with elementary principles of procedural due process," *id.,* require him to shed his cloak of immunity.

Somewhat along these lines, the Court also suggested in *Stump* that the degree of tragedy wrought by a defendant judge's action does not stand as an independent factor to be weighed in an immunity analysis. *See* 435 U.S. at 363, 98 S.Ct. at 1108. Thus, we do not intimate, and indeed consider it inappropriate to do so, that Judge Merckle's actions were more or less egregious than Judge Stump's.

**15.** *See generally Watson v. Interstate Fire & Gas Co.,* 611 F.2d 120 (5th Cir. 1980); *Crowe v. Lucas,* 595 F.2d 985 (5th Cir. 1979).

**16.** While our resolution of the case eliminates the need to determine whether Judge Merckle's actions were within his jurisdiction, we do note that *Stump* mandates a broad construction of the term "jurisdiction." *See* 435 U.S. at 357, 98 S.Ct. at 1105; *see also Williams v. Sepe,* 487 F.2d 913 (5th Cir. 1973). In fact, the Court in *Stump* drew on *Bradley*'s distinction between acts "in excess of jurisdiction" (criminal court judge convicts plaintiff for a nonexistent crime, *cf. Turner v. Raynes,* 611 F.2d 92, 93–97 (5th Cir. 1980)) and acts "in clear absence of all jurisdiction" (probate judge tries a criminal case), *see Bradley v. Fisher, supra,* 80 U.S. (13 Wall.) at 352. Immunity is lost to the judge only in the latter class of jurisdictionally defective cases.

allegedly unconstitutional actions clearly took place "in the judge's chambers." But under the third and fourth factors of *McAlester*, Judge Merckle's position loses ground. The controversy that led to Harper's incarceration did not center around any matter "then pending before the judge"; rather, it centered around the domestic problems of one of the Judge's friends, Harper's former wife. These problems were brought to the Judge's attention in a social, not judicial, forum. Moreover, as the facts clearly establish, Harper did not visit Judge Merckle "in his official capacity." To the contrary, Harper sought only his former wife, whose office was adjacent to Judge Merckle's chambers, to settle his account with her.

The emphasis that we place upon the third and fourth factors of *McAlester* is clearly warranted under the language of *Stump*. There Justice White distilled the relevant cases addressing the term "judicial act" and concluded that consideration must be given not only to "the nature of the act itself" but also "to the expectations of the parties." 435 U.S. at 362, 98 S.Ct. at 1107, see *Crowe v. Lucas, supra,* 595 F.2d at 990. While in *Stump* "both factors indicate[d] that . . . approval of the sterilization petition was a judicial act," 435 U.S. at 362, 98 S.Ct. at 1107 (footnote omitted), in the case before us they do not. We think it clearly unreasonable to conclude that Harper entertained the expectation that judicial matters were at hand when he entered Judge Merckle's office on nonjudicial business. Plaintiff's incredulity during the "hearing," see *supra* at pp. 852–53 indicates as much.

*Stump* and *McAlester*, the guiding lights in our analysis, point in one direction: Judge Merckle's actions on August 16, 1974 were not "judicial acts." But we caution that our holding is exceedingly narrow and is tailored to this, the rarest of factual settings.[17] Succinctly stated, we hold only that when it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears certain that no party has invoked the judicial machinery for any purpose at all, then the judge's actions do not amount to "judicial acts." These nonjudicial acts, to state the obvious, are not cloaked with judicial immunity from suit under § 1983.

We find, accordingly, that Judge Merckle should not be accorded absolute judicial immunity because his acts were not "judicial acts." As such, we need not reach the question of whether he acted in complete absence of jurisdiction.

### III. *Special Interrogatories*

Plaintiff claims that the trial court erroneously submitted interrogatories 4, 5, 6, and 7[18] to the jury. This argument is urged on several levels. First, plaintiff states the four interrogatories correspond to what the trial court *mistakenly* regarded as the four elements of the tort of false imprisonment. Second, plaintiff argues that interrogatory 7's subject matter—awareness of confinement and resultant damages—was "irrefutably established" and thus too clear for submission as an interrogatory. We consider these arguments now.

---

17. To exemplify the extremely limited applicability of our holding we point out that our considerable research has revealed only one case, *Zarcone v. Perry,* 572 F.2d 52 (2d Cir. 1978), arguably within the ambit of our holding. *See generally* Rosenberg, Stump v. Sparkman: *The Doctrine of Judicial Impunity,* 64 Va.L.Rev. 833, 848 n.65 (1978). There, defendant, a traffic court judge sent a deputy sheriff out to purchase some coffee from a coffee vendor. Both judge and deputy sheriff tasted the coffee and concluded it was "putrid." On the defendant judge's orders, the coffee vendor was handcuffed, brought before the judge in his

chambers, and subjected to "20 minutes" of the judge "screaming at him, threatening him and his livelihood . . . and thoroughly scaring him." *Id.* at 53. After his first release, the vendor was again brought before the judge for an abbreviated, but similar encounter. The reported case does not even address the immunity issue, presumably because the judge was willing to concede his actions were not "judicial acts," but dealt in large part with the propriety of a $60,000 punitive damages jury award for the coffee vendor. That award was affirmed.

18. *See* note 6 *supra.*

## A. *Prima Facie Case*

The elements of the tort of false imprisonment, so reiterated by our own Court in *Bryan v. Jones*, 530 F.2d 1210, 1213 (5th Cir.), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976), are: "(1) intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm . . . ." To state a claim upon which relief can be granted for the commission of a *constitutional* tort, plaintiffs additionally must satisfy the prerequisites of 42 U.S.C. § 1983 (1976).

█ Plaintiff Harper, in a gossamer assertion, states that "illegality" need not be proved as part of his prima facie case; rather, the notion of legality *vel non* properly enters this case only by way of defendant's affirmative defense. We observe first that Harper's own complaint, wherein he alleges four times that defendant acted "unlawfully," belies his present position. Second it is beyond peradventure that § 1983 targets *illegal* not legal action under color of state law.[19] A constitutional tort has both constitutional and tortious dimensions. When the tort is false imprisonment, *Bryan, supra,* controls as to the elements of the tort. But regardless of the underlying tort, resort must be to § 1983, which requires in the clearest of terms a deprivation of a constitutional right, *i. e.,* an *illegality,* under color of state law. That "illegality" is an obvious and inherent element of Harper's prima facie § 1983 case is without doubt. The apparent cause of plaintiff's confusion on this point is the language in *Bryan,* cited by plaintiff, which states:

"[I]ntent to imprison *without legal authority* need not be proved as an element of the prima facie case," 530 F.2d at 1213 (emphasis in original) (footnote omitted). By that language the Court meant only that a defendant's *belief* that his actions are lawful, a question quite apart from legality *vel non,* is relevant as an affirmative defense. *See id.* ("Thus, a prima facie case is made out against a jailer even when he believes he has legal authority to detain a prisoner. Accordingly, whatever impact his good faith has, it must be as an element of a defense").

█ Although we do not doubt that "illegality" must be proved by the plaintiff in a § 1983 false imprisonment, we nonetheless find error in submitting that issue to the jury. The illegality of Judge Merckle's actions could hardly be more lucid. Defendant's theory at trial was that he was acting as a "conservator of the peace"[20] when he jailed Harper. Such an officer has the power to arrest and to commit pending trial. Judge Merckle did more; he acted as complaining witness, "arresting" officer—although Harper was not formally arrested—finder of fact, and judge.[21] All of these actions were taken without regard for the Fourteenth Amendment, *see Anderson v. Nosser,* 456 F.2d 835, 841 (5th Cir.) *cert. denied* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972), or the Constitution of the State of Florida, *see e. g.,* Fla.Const. art. I, § 14 (bail as a matter of right).

Judge Merckle's actions were, then, clearly illegal.[22] And in the face of such obvious

---

19. Any doubt on this point is resolved in *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979) ("the first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' "). Moreover, in that case, the Supreme Court warned us not to view a " '[§] 1983 false imprisonment action' exclusively in terms of traditional tort-law concepts . . . ." *Id.* at 142, 99 S.Ct. at 2693.

20. Fla.Const. art. V. § 19 provides: "All judicial officers in this state shall be conservators of the peace." Similarly, Fla.Stat.Ann. § 901.01 (West Cum.Supp.1980) states: "Each state judicial officer is a conservator of the peace and a committing magistrate with authority to issue

warrants of arrest and commit offenders to jail and recognize them to appear to answer the charge . . . ."

21. While a judicial officer who witnesses a contempt in his own courtroom may be said to be acting in several roles as well, the alleged courtroom contemnor of course would have, as Harper did not here, benefit of counsel.

22. We hasten to point out that illegality *per se* of Merckle's actions has no effect on the judicial immunity issue. For this proposition, we look no further than *Stump:* so long as he meets the test (judicial act not clearly outside his subject matter jurisdiction), a "judge is ab-

illegality, the district court committed reversible error by submitting that question to the jury.

### B. *Interrogatory 7*

 This interrogatory, to reiterate, addresses plaintiff's awareness of his confinement and his resulting "damages." Although the inexplicable jury response to interrogatory 7 was negative, the appropriate answer to the question shines forth from the facts, the evidence, and the pretrial stipulation.

As to the first part of the compound question posed by interrogatory 7, we note that nowhere does Judge Merckle assert that Harper was "unaware" of his confinement. Moreover, that element of a prima facie case is usually only relevant in rare circumstances, *e. g.*, when a plaintiff allegedly slept through the commission of a tort on his person. *See* Restatement (Second) of Torts § 42, Comment a (1965). Accordingly, submission of the interrogatory to the jury was erroneous as it suggested doubt concerning an undisputed issue.

As to the "damages" aspect of interrogatory 7, we also find error. The interrogatory unfortunately contained the word "damages" when no doubt the term "harm" should have been used as it was in both *Bryan v. Jones, supra*, 530 F.2d at 1213, and Restatement (Second) of Torts § 35 (1965), upon which *Bryan* was based. Defendant, however, attempts to justify this language arguing that the jury was instructed to "weigh Harper's own conduct and prior actions in determining damages" and in so doing "could reasonably conclude that Harper caused any and all damages by his criminal or contemptuous conduct." This misses the mark; the issue of "damages"— entirely separate from the question of

"harm"—was covered expressly by interrogatories 8 and 9, which, per the court's instructions, the jury never reached. If the jury did in fact "weigh Harper's own conduct" in answering interrogatory 7, as defendant himself suggests, then the commission of reversible error occurred in fact as well as in law.

### IV. *Requested "Pretrial Procedure" Jury Instructions*

 Defendant asserted at trial that he was *entitled to qualified immunity* since his actions—the very ones we hold to be nonjudicial—were consistent with his state constitutional status as a conservator of peace.[23] We regard that status for purposes of the immunity question, as analogous to that of a police officer empowered to arrest and detain suspected violators of the law. Accordingly, the immunity potentially applicable to Merckle is qualified: he would be immune from damage liability under § 1983 unless "he knew or reasonably should have known that the action he took . . . would violate the constitutional rights of [plaintiff] . . ., or if he took the action with the malicious intention to cause a deprivation of [plaintiff's] constitutional rights . . . ." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Essentially, then, defendant may show "good faith and probable cause," *Pierson v. Ray, supra*, 386 U.S. at 557, 87 S.Ct. at 1219, clearly a cognizable defense under § 1983, *id; Bryan v. Jones, supra.*

These principles were recognized by the district court and were embodied in special interrogatories 8 and 9 submitted to the jury. Plaintiff, however, argues that the trial court committed reversible error through its refusal to charge the jury the text of Fla.R.Crim.P. 3.130(a) & (b).[24] The

---

solutely immune from liability . . . even if his exercise of authority is flawed by the commission of grave procedural errors." 435 U.S. at 359, 98 S.Ct. at 1106.

**23.** *See* note 20 *supra.* We have no difficulty concluding that Judge Merckle, though not acting in a "judicial" role under our holding, might have been acting in another capacity recognized by the law of Florida. *Cf. Gregory v. Thompson*, 500 F.2d 59, 63–65 (9th Cir. 1974).

**24.** The rule's first two subsections state:

(a) Offenses Less Than Capital. All persons in custody for the commission of an offense unless it is a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great shall be entitled as of right to be admitted to bail before conviction. After

contention is that the relevant subsections of the Florida rule, which deals with bail[25] and first appearance procedures, could have given the jury a basis upon which to determine good faith *vel non*. The defendant counters that this infirmity can only be viewed as harmless, since the jury never reached the qualified immunity issue, as the responses to the special interrogatories indicate.

 While we agree that the relevant subsections of the Florida rule are germane to the question of good faith in its "objective" sense,[26] we think defendant's argument—that this error alone could not be reversible—is well taken. Accordingly, and in light of our reversal on other grounds, we need not hold that failure to charge both requested portions of the Florida rule constituted reversible error. Instead, we instruct the trial judge to so charge the jury on retrial of this case, providing the defendant asserts the defense of qualified immunity.

## V. *Conclusion*

As indicated in our detailed treatment of the issues above, we hold first that defendant may not assert absolute immunity under the facts of this case and second that the special interrogatories submitted to the jury by the trial court contained reversible error. Accordingly, we reverse the judgment entered by the district court and remand the case for new trial.

REVERSED and REMANDED.

conviction bail may be granted in the discretion of either the trial or appellate court.
 (b) First Appearance.
 (1) Prompt First Appearance.
 Except when he has been previously released in a lawful manner, every arrested person shall be taken before a judicial officer within twenty-four (24) hours of arrest. The chief judge of the circuit for each county within the circuit shall designate one or more judicial officers from the circuit court, or county court, to be available for first appearance and proceedings.
 (2) Advice to Defendant.
 Upon the defendant's first appearance the magistrate shall immediately inform him of the charge and provide him with a copy of the complaint. The magistrate shall also adequately advise the defendant as follows:
 (i) That he is not required to say anything, and that anything he says may be used against him;

 (ii) If he is as yet unrepresented, that he has a right to counsel, and, if he is financially unable to afford counsel, that counsel forthwith will be appointed.
 (iii) That he has a right to communicate with his counsel, his family, or his friends, and that, if necessary, reasonable means will be provided to enable him to do so.
Fla.R.Crim.P. 3.130(a) & (b).

25. Plaintiff concedes that "the portion [of the rule] regarding bail was substantially covered by the Court" but insists, and we agree, that "the balance of the instruction was entirely proper and relevant."

26. *See Bryan v. Jones, supra*, 530 F.2d at 1214 (good faith standard "contains both a subjective element of good faith and an objective element of reasonableness").