Joseph BREWER, et al.,
Plaintiffs-Appellants,

v.

M. Prentiss BLACKWELL, et al.,
Defendants-Appellees.

No. 81–3627.

United States Court of Appeals,
Fifth Circuit.

Nov. 29, 1982.

Deutsch, Kerrigan & Stiles, Frank M. Re-Pass, III, Slidell, La., for plaintiffs-appellants.

Edward A. Shamis, Jr., Slidell, La., for Blackwell.

Ronald W. Guth, Wm. J. Faustermann, Jr., Slidell, La., for McGehee and Pearl River.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before RUBIN and JOHNSON, Circuit Judges, and VERON *, District Judge.

---

\* United States District Judge, Western District of Louisiana, sitting by designation.

1. The state and federal claims against the mayor were voluntarily dismissed at the close of the plaintiffs' case.

2. *See Supreme Court of Va. v. Consumers Union,* 446 U.S. 719, 733, 100 S.Ct. 1967, 1974, 64

ALVIN B. RUBIN, Circuit Judge:

On a winter day in 1978, four young men working for a company engaged in pruning trees were sent to dump a load of what they thought to be tree branches at a rural landfill. Their arrest on the felony charge of contaminating water supplies, *see* La. Rev.Stat.Ann. 14:58 (West 1974), because the load they dumped contained garbage, led to this suit for $1.5 million in compensatory and $1.5 million in punitive damages. They sued a justice of the peace, the mayor of the town in whose jail they were confined, the town's chief of police, and the town both for violation of their civil rights and on pendent state tort claims. The district court rendered a directed verdict in favor of the justice of the peace on the ground of judicial immunity, and in favor of the chief of police and the town on the ground that their conduct was neither wrongful nor constituted a tort under state law.[1] The court then dismissed the pendent state claims against the justice of the peace on the ground that the basis for invoking federal jurisdiction was insubstantial and the claims should be tried in state court. We affirm in part but, finding that there was sufficient evidence in support of some of the federal claims to warrant jury submission, we reverse and remand for a new trial of those claims.

## I.

Much like the load of refuse, the facts were dumped in disorderly fashion. The district judge, in ruling on the motion for directed verdict, made no separate findings of fact. We must, however, deduce his fact findings because whether an official is protected by judicial immunity is a question of law[2] and the facts found by the district judge in making that determination are to

L.Ed.2d 641, 654 (1980); *Stump v. Sparkman,* 435 U.S. 349, 357–61, 98 S.Ct. 1099, 1105–07, 55 L.Ed.2d 331, 339–342 (1978); *Rheuark v. Shaw,* 477 F.Supp. 897 (N.D.Tex.1979), *aff'd in part & rev'd in part,* 628 F.2d 297 (5th Cir. 1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981).

be reviewed under the "clearly erroneous" standard. *See Pullman-Standard v. Swint,* —— U.S. ——, —— n. 16, 102 S.Ct. 1781, 1788 n. 16, 72 L.Ed.2d 66, 78 n. 16 (1982). On jury-determinable issues, the sufficiency of the evidence to make a jury case is also a question of law, and we must reassess the trial judge's appraisal of the evidence to determine whether a reasonable juror could have reached a verdict for the plaintiffs. *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc). In reviewing the grant of a motion for a directed verdict, we consider all of the testimony in the light most favorable to the party opposing the motion, in this case the plaintiffs. *New England Merchants National Bank v. Rosenfield,* 679 F.2d 467, 473 (5th Cir.1982). With these several standards in mind, we sort out the leaves and branches of testimony.

Asplundh Tree Experts, the plaintiffs' employer, furnishes various dendrological services including trimming branches from trees. Using mechanical equipment, Asplundh grinds the debris and deposits it in a truck. When the truck is full, the load is carted to a dump for disposal. Asplundh had been dumping at a landfill waste depository in a rural part of St. Tammany Parish known as Florenville.

■ The residents of the area near Florenville use artesian wells for water. They had become concerned about the possible contamination of their water supply as a result of the deposit of garbage in the landfill and had instituted civil litigation to enjoin use of the landfill.[3]

In December, 1978, four youthful Asplundh employees, plaintiffs Joseph Brewer, age 19, Lionel Matherne, age 20, Gerry Guidry, age 18, and Robert Brewer, age 18, were sent by their supervisor, Jesse Reavis, to dump a truck load of trash at the landfill. A number of local citizens, including M. Prentiss Blackwell, a Justice of the Peace for the Sixth Ward of the Parish, were at the entrance to the landfill when the truck arrived. Two of the persons present had been deputized as constables by the elected Sixth Ward constable, but the constable himself was not present.

When the truck, driven by Joseph Brewer, arrived at the landfill, one of the persons already present instructed the plaintiffs that they could enter the landfill area to dump trash but that, if they dumped a load that included garbage, they would be arrested. The explanation offered at the trial for this instruction was that tree cuttings would not pollute the artesian well water but that garbage would. Two of the plaintiffs testified that Blackwell, the Justice of the Peace, gave this instruction. One of the deputized constables, Joseph Yates, testified that he gave this instruction, and both plaintiff Matherne and defendant Blackwell supported that testimony.

Obeying his supervisor's instructions, Joseph Brewer drove into the landfill area, and dumped the load. The Asplundh employees testified that the load contained tree cuttings but no food waste except a few cans and bags that they had thrown in the truck after lunch the previous day. They did not know whether there was other debris beneath the surface of the load. Blackwell and Yates testified that, when the load was dumped, it contained plastic

---

**3.** Justice of the Peace M. Prentiss Blackwell, one of the defendants here, was the plaintiff in a suit to enjoin dumping at the landfill. Blackwell testified that he considered his duties as Justice of the Peace to include "representing" the citizens of St. Tammany Parish. He testified that he believed that the garbage from the dump leached or seeped into the artesian wells, contaminating them. He stated that he was at the dump on the day in question to protect the rights of the citizens of the Sixth Ward. However, Louisiana law does not contemplate that the official duties of Justices of the Peace include participation in private disputes. *See In re Wilkes,* 403 So.2d 35, 40–43 (La.1981); La. Rev.Stat.Ann. § 13:2584 (West Supp. 1982).

The Louisiana Environmental Control Commission has ordered that the Sixth Ward landfill be closed by June 25, 1984. The state has imposed no restrictions on what may be dumped at the landfill until that time; it requires only that the refuse be covered every two days and forbids open burning. However, under Louisiana law municipalities have concurrent jurisdiction over landfills and may impose restrictions on them provided that the restrictions do not conflict with rules established by the state.

garbage bags, one or more of which was broken, exposing garbage. The bags were not seized or retained as evidence.

When Brewer attempted to drive out of the landfill area, his truck's path was blocked by a pickup truck that had been parked so as to bar the exit. Someone ordered all four Asplundh employees to dismount and informed them that they were under arrest.[4] Two of the plaintiffs testified that it was Blackwell who made the arrest. Blackwell denied arresting anyone, and he and Yates both testified that Yates made the arrest. Plaintiff Matherne also testified that Yates made the arrest.[5] The four plaintiffs were then ordered to get into the back of the pickup truck so that they could be taken to Blackwell's office, which was at his home. Three mounted the pickup, but Joseph Brewer insisted on following in the truck he had driven to the site. The Justice of the Peace followed in his automobile, and the convoy headed for his residence. However, when the trucks reached a fork in the road where the route to the Blackwell's residence diverged from the road to Slidell, Louisiana, Brewer made for his supervisor's home in Slidell, seeking help. Blackwell pursued Brewer in his personal car. When Brewer stopped at his supervisor's residence, Blackwell leaped out of his vehicle, showed the supervisor his identification card, and, according to the supervisor, said: "that boy is under arrest." Blackwell stated, the supervisor testified, that he would call the state police if Brewer refused to go with him. The supervisor testified that he "assume[d] the boy [was] under arrest." Brewer testified that he understood Blackwell to have arrested him. Blackwell testified, however, that he did not then place Brewer under arrest or force Brewer to accompany him. At any rate, on the supervisor's advice, Brewer left the truck in Slidell and went with Blackwell in Blackwell's car.

What happened when Blackwell arrived at his office-residence is also disputed. The four plaintiffs gave varying accounts but there was testimony that Blackwell told them that: he had seen them pollute the water supply so they were guilty and could be put in jail or fined $1,000; he would act as their attorney and also as their prosecutor; he would "give them a break" and "fine" them only $37.50 each, and he was fining each of them $37.50 except the driver, who was also charged with reckless driving and would be fined $75. The plaintiffs' testimony, in sum, is that Blackwell conducted a trial, found them guilty (or forced them to plead guilty), and sentenced them to pay a fine. There was testimony, disputed by Blackwell, that, while the parties were at Blackwell's residence, he had a telephone conversation with Assistant District Attorney Kurt Sinns. Sinns was familiar with the water pollution complaint, which had become a local *cause celebre,* and had seen a report about the landfill (featuring an interview with Blackwell) on television. Sinns testified that he told Blackwell that the plaintiffs should be released.

Blackwell and Yates testified that: no trial was held; Yates executed an affidavit to support a warrant for the arrest of the four, and Blackwell issued the warrant and then fixed bail for three of the plaintiffs at $37.50 and for Joseph Brewer at $75. Yates' affidavit and the arrest warrant were introduced into evidence. Blackwell testified that, because none of the plaintiffs had money for bail, Yates and Blackwell's first cousin, Walter, another deputy constable, transported the four to the Pearl River jail, where they were booked.[6]

---

4. They were later charged with violation of La.Rev.Stat.Ann. § 14:58 (West 1974), making intentional contamination of water supplies a felony. Water pollution charges are typically handled under the Environmental Control Act through the Environmental Control Commission. *See id.* §§ 30:1091 to :1096 (West Supp. 1982); Note, *Water Pollution in Louisiana, An Attempt at Control,* 18 Loy.L.Rev. 734, 738–45 (1972).

5. Plaintiff Guidry did not state on direct examination who arrested him. On cross-examination, he replied affirmatively to questions referring to his arrest "by the constables," but was never directly asked who arrested him.

6. For reasons which do not appear in the record, Justice of the Peace Blackwell also went to the Pearl River jail. He traveled separately from the prisoners.

While the plaintiffs were at the jail, Assistant District Attorney Sinns telephoned Pearl River Chief of Police McGehee. He stated that the case should not be handled as a criminal matter and advised the Chief that he was nolle prossing the charges and that the four plaintiffs should be released.[7] The Chief had the plaintiffs booked, then telephoned the City Attorney, who advised the Chief to release the four on their own recognizance but to obtain an agreement from each of them holding the City and the Chief harmless for their detention. The four signed the agreement and the Chief then released them on their own recognizance. The testimony is contradictory concerning how long these events required, but there was general agreement that the plaintiffs' detention at the jail lasted approximately one hour. It is not clear how much time elapsed between conversation with the city attorney and their release. The plaintiffs were never tried on the pollution charges. The only sequel to the day's events is this litigation.

At the close of the plaintiffs' evidence, the district judge directed a verdict in favor of all defendants on the federal claims and in favor of Chief McGehee and the town on the state claims. He later dismissed the state claims against Blackwell without prejudice.

The judge resolved the § 1983 claim against Blackwell by holding that all of his actions were protected by judicial immunity. He stated: "[c]ounsel agreed that Blackwell had the authority and jurisdiction to issue the arrest warrant and fix bail on the underlying felony for which plaintiffs were charged. La.C.Crim.Proc. arts. 202, 291." [8]

The district court directed a verdict on the § 1983 claim against Chief McGehee because it concluded that his acts were purely ministerial. Relying on Article 228 of the Louisiana Code of Criminal Procedure, the court found that it was the Chief's duty to book all persons who had been arrested and delivered into his custody, and to imprison them until instructed to release them. The court followed Louisiana authority holding that prisoners are under the plenary control of the judiciary in determining that Assistant District Attorney Sinns had no authority to order the plaintiffs' release. *Proceedings ex rel. Judge of Section A of Criminal District Court v. Grosch,* 222 La. 937, 64 So.2d 225 (1953). The court also found no evidence that the Chief or any of his officers participated in any unlawful or unconstitutional acts against the plaintiffs.

The court directed a verdict on the federal claim against the Town of Pearl River because there was no evidence that the acts alleged to have damaged the plaintiffs were undertaken pursuant to municipal policy or custom or that the acts were authorized, sanctioned, or ratified by municipal policymakers. *See Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611, 635 (1978).

The court directed a verdict against the plaintiffs on the pendent state false arrest and false imprisonment claims against the Town and the Chief for failure to establish the illegality of the detention. *See Rawls v. Daughters of Charity of St. Vincent De*

---

**7.** It is not clear from the record whether Chief McGehee received Sinns' call before or after the plaintiffs had been booked into the Pearl River Jail. At oral argument, counsel for McGehee stated that the phone call came after the plaintiffs arrived at the jail but before they were booked.

**8.** On their motion to set aside the directed verdict, plaintiffs changed course and argued that Yates' affidavit, which was the root of the arrest warrant, depended largely on Justice of the Peace Blackwell's allegations rather than Yates' personal knowledge. We assume, *arguendo,* that this is at least partially true, for it is clear that Yates had no knowledge of Brewer's reckless driving apart from what Blackwell told him.

Nevertheless, these facts would not strip Blackwell of his immunity in signing the arrest warrant. Signing the warrant was a judicial act for which Blackwell is protected by absolute immunity even if Blackwell knew the affidavit to be false and acted maliciously in signing the warrant. *Stump v. Sparkman,* 435 U.S. at 358, 98 S.Ct. at 1104, 55 L.Ed.2d at 340; *see Heimbach v. Village of Lyons,* 597 F.2d 344 (2d Cir.1979) (per curiam).

*Paul, Inc.,* 491 F.2d 141, 146–47 (5th Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974). The court concluded that the detention was lawful because it was predicated on the existence of a valid arrest warrant.

Finally, the district judge dismissed the pendent state law claims against Justice of the Peace Blackwell for lack of jurisdiction because he viewed them as the "real body" of the case, to which the federal claim was "only an appendage." *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218, 228 (1966). The judge also based his dismissal of the state claims against Blackwell on his conclusion that four of the legal questions presented issues on which the state courts had provided no substantial guidance. *See id.* at 726 & n. 15, 86 S.Ct. at 1139 & n. 15, 16 L.Ed.2d at 228 & n. 15. We consider first the claims against Justice of the Peace Blackwell, second the claims against Chief McGehee, and finally the claims against the Town of Pearl River.

## II.

At the outset, we must consider whether the plaintiffs' claims are affected by the decision in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).[9] *Parratt* held that a state prisoner alleging a fourteenth amendment violation based on a negligent deprivation of property received the process due him because he had resort to a state tort claims procedure that "could have fully compensated [him] for the property loss he suffered . . . ." *Id.* at 544, 101

**9.** This issue was raised but not decided by the court in *Richardson v. Fleming,* 651 F.2d 366, 372 n. 10 (5th Cir.1981).

**10.** Every state presumably permits a tort suit against state officials who wrongfully arrest or detain citizens. To hold state court remedies sufficient in cases involving intentional liberty deprivations would be, in effect, to "prefer" state to federal remedies even though plaintiffs had clearly made out a prima facie federal case. The Supreme Court categorically rejected a suggestion that state remedies are "preferred" over the § 1983 remedy two decades ago in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The *Monroe* Court stated:

S.Ct. at 1917, 68 L.Ed.2d at 434. Louisiana jurisprudence establishes that, had the plaintiffs proved the facts underlying their claims, a tort remedy would have been available in state court. Indeed, the plaintiffs acknowledged the existence of state remedies by raising pendent claims. Does the tort committed against them constitute a denial of their liberty without due process?

Justice Blackmun's concurring opinion in *Parratt* expressly distinguishes between negligent and intentional deprivations: "When it is possible for a State to institute procedures to contain and direct the *intentional* actions of its officials, it should be required, as a matter of due process, to do so." *Id.* at 546, 101 S.Ct. at 1918, 68 L.Ed.2d at 435 (Blackmun, J., concurring) (emphasis added). *Accord id.* at 546, 101 S.Ct. at 1918, 68 L.Ed.2d at 435 (White, J., concurring); *id.* at 554, 101 S.Ct. at 1923, 68 L.Ed.2d at 441 (opinion of Marshall, J.).

Justice Blackmun's concurrence also draws a line between property and liberty interests. He "do[es] not read the Court's opinion as applicable to a case concerning deprivation of life or of liberty." *Id.* at 545, 101 S.Ct. at 1918, 68 L.Ed.2d at 435. *Accord id.* at 545, 101 S.Ct. at 1918, 68 L.Ed.2d at 435 (White, J., concurring).[10]

Later, in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the Court explained its decision in *Parratt.* The majority opinion, joined by seven members of the Court, cited Justice Blackmun's concurring opinion in *Parratt* with approval. *Id.* at 436, 102 S.Ct. at

"It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* at 183, 81 S.Ct. at 482, 5 L.Ed.2d at 503. *See Wakinekona v. Olim,* 664 F.2d 708, 715 n. 1 (9th Cir. 1981) *cert. granted on other grounds,* —— U.S. ——, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982); *Ehlers v. City of Decatur,* 614 F.2d 54, 56 (5th Cir.1980); *cf. Patsy v. Board of Regents,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies not required in § 1983 action).

1158, 71 L.Ed.2d at 279. The Court held that *Parratt* was inapplicable to cases involving challenges to "the state system ... that destroys a complainant's property interest, by operation of law ... whether the ... action is taken through negligence, maliciousness, or otherwise." *Id.*

In this case, of course, it is not alleged that the state system was responsible for depriving the plaintiffs of their liberty. But given the Court's citation of Justice Blackmun's *Parratt* concurrence, and the Court's narrow reading of *Parratt* in *Logan,* we decline to give *Parratt* the sweeping interpretation required to encompass the intentional deprivation of liberty involved in this case. *See Wakinekona v. Olim,* 664 F.2d at 715 & n. 1.

Even though *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), involved an intentional deprivation of liberty, this case cannot be likened to *Ingraham* for the reasons pointed out in *Logan. Ingraham* held that state tort remedies provide adequate process for students subjected to corporal punishment in schools. But, as the *Logan* Court explained, *Ingraham* was a unique case. The state scheme merely preserved the teacher's historic common-law privilege to corporally punish students. Moreover, exacting procedural safeguards before the imposition of such pun-

ishment would have been unduly burdensome. *Logan,* 455 U.S. at 422, 436 n. 10, 102 S.Ct. at 1158 n. 10, 71 L.Ed.2d at 278 n. 10.

Unauthorized arrest, trial, and detention is "hardly a practice in line with our common-law traditions." *Id.* Exacting damages for such transgressions does not involve the *addition* of any procedural safeguards; the plaintiffs' complaint is that existing safeguards relating to the conduct of arrests and criminal trials were not observed.

■ The plaintiffs in this case contend that a state official intentionally deprived them of their liberty by acts not undertaken in the exercise of a historically recognized official right to make such an invasion, and that, in addition to depriving them of their liberty, the state official purposely disregarded existing procedural safeguards designed to protect them against such deprivations. The possibility that the plaintiffs may secure redress in a state court does not suffice to provide them with due process for either the alleged procedural or the substantive due process violation.[11] *Parratt* does not, therefore, bar relief. We refrain from attempting otherwise to define the situations to which its doctrine applies.

---

**11.** We recognize that other circuits have reached apparently contrary results. *See Johnson v. Miller,* 680 F.2d 39, 42 (7th Cir.1982); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981). The *Rutledge* court did not have the benefit of *Logan,* particularly its express approval of Justice Blackmun's concurrence.

We cannot explain the decision in *Johnson* so easily. The plaintiff in that case was arrested *twice* under a warrant improperly issued in her name. The court held that the first arrest was shielded by the decision in *Baker v. McCollan,* a conclusion which accords with our holding in *infra* Part IVA.

Without mentioning *Logan,* the court then held that the second arrest was not actionable under § 1983 because the lawsuit "duplicates" state tort remedies for false imprisonment, false arrest, and other state claims. 680 F.2d at 42. The court did not hold that the plaintiff had not been deprived of her liberty, nor did it cite *Parratt* or *Logan.* It merely stated: "The conduct alleged ... is outrageous, but it is also

fully actionable under state law. It is not actionable under section 1983 ...." *Id.* The court cited no case for this proposition, although it referred to one of our cases, *Smith v. Gonzales,* 670 F.2d 522 (5th Cir.1982), in which the arrest was pursuant to a *valid* warrant. It did not refer to other decisions, including those within its own circuit, holding that a false arrest and detention is actionable under § 1983. *See, e.g., Harper v. McDonald,* 679 F.2d 955 (D.C.Cir.1982) (per curiam); *Murray v. City of Chicago,* 634 F.2d 365, 366 (7th Cir.), *cert. granted on other grounds,* 454 U.S. 962, 102 S.Ct. 501, 70 L.Ed.2d 377 (1981), *cert. dismissed,* —— U.S. ——, 102 S.Ct. 2226, 72 L.Ed.2d 366 (1982); *Hampton v. Hanrahan,* 600 F.2d 600, 630 (7th Cir.1979); *rev'd in part per curiam,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Pritchard v. Perry,* 508 F.2d 423, 425 & n. 1 (4th Cir.1975) (collecting cases); *Nesmith v. Alford,* 318 F.2d 110 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964).

III. Justice of the Peace Blackwell

A. *The § 1983 Claim*

A judge, of whatever status in the judicial hierarchy, is immune from suit for damages resulting from any act performed in the judicial role. *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 734, 100 S.Ct. 1967, 1976, 64 L.Ed.2d 641, 655 (1980). This immunity extends to Justices of the Peace as well as those who sit on the Supreme Court, *Turner v. Raynes*, 611 F.2d 92 (5th Cir.) *cert. denied*, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 129 (1980), and shields judges unless they act either in "the clear absence of all jurisdiction over the subject matter" or in a nonjudicial capacity. *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646, 651 (1872), *quoted in Stump v. Sparkman*, 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331, 339 (1978).[12]

When, however, judicial officers act in a "nonjudicial" capacity, they are not immune from liability for that conduct. *See, e.g., Gregory v. Thompson*, 500 F.2d 59 (9th Cir.1974). If on occasion their acts involve both judicial and nonjudicial conduct, the unprotected behavior must be separated from the shielded and judges are liable for the acts that were not judicial. *Crowe v. Lucas*, 595 F.2d 985, 990 (5th Cir. 1979). *See also Lopez v. Vanderwater*, 620 F.2d 1229, 1235 (7th Cir.), *cert. denied*, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980); *Harris v. Harvey*, 605 F.2d 330, 336 (7th Cir.1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980); *Krueger v. Miller*, 489 F.Supp. 321 (E.D.Tenn.1978), *aff'd mem.*, 617 F.2d 603 (6th Cir.1980).

The plaintiffs at oral argument did not contest that Blackwell acted in his judicial capacity in issuing the arrest warrant based on Yates' affidavit. *See* La.Code Crim.Proc.Ann. art. 201 (West Supp.1982); *see also United States v. Wilkes*, 685 F.2d 135, 138 (5th Cir.1982). Blackwell enjoys

absolute immunity for that act. *Keeton v. Guedry*, 544 F.2d 199, 200 (5th Cir.1976) (per curiam).

The plaintiffs argue, however, that the following acts were either nonjudicial or were undertaken in the complete absence of jurisdiction, rendering Blackwell liable for their commission.

1. The alleged arrest at the dump by Blackwell;
2. The pursuit of Joseph Brewer;
3. The alleged trial and the various acts attendant thereto, specifically:
 a. telling plaintiffs they were in serious trouble;
 b. offering to give plaintiffs a break and only fine them;
 c. finding the plaintiffs guilty or asking the plaintiffs to plead guilty, or both;
 d. offering to act as the plaintiffs' attorney; and,
 e. failing to warn plaintiffs of their right to remain silent and to have an attorney of their own choosing;
4. Requiring the plaintiffs to sign hold-harmless agreements before releasing them from jail.

We review the alleged acts to determine whether, if committed, they would give rise to a cause of action under § 1983.

1. The "Arrest"

The Supreme Court in *Stump* identified two factors relevant to determining whether a given act is judicial. First, the act must be of the sort judges ordinarily perform. *Stump*, 435 U.S. at 362, 98 S.Ct. at 1107, 55 L.Ed.2d at 342. Second, the parties must have been dealing with the judge "in his judicial capacity." *Id.* This circuit has refined those criteria into a four-part test. We inquire, in determining the judicial nature of an act, whether: (1) the act complained of is a normal judicial function; (2) the events occurred in the judge's court or chambers; (3) the controversy cen-

---

**12.** The *Stump* Court distinguished between "excess" and "clear absence" of jurisdiction by quoting the example given by the *Bradley* Court. Thus, a criminal court judge who convicts a defendant of a nonexistent crime acts in excess of jurisdiction and is absolutely immune. *Stump*, 435 U.S. at 357 n. 7, 98 S.Ct. at 1105 n. 7, 55 L.Ed.2d at 339 n. 7; *Turner v. Raynes*, 611 F.2d at 97. But a probate judge who tries and convicts a defendant of a crime acts in the clear absence of jurisdiction and enjoys no immunity. *Stump*, 435 U.S. at 357 n. 7, 98 S.Ct. at 1105 n. 7, 55 L.Ed.2d at 339 n. 7.

tered around a case then pending before the judge, and (4) the confrontation arose directly and immediately out of a visit to the judge in his judicial capacity. *See Harper v. Merckle,* 638 F.2d 848, 858 (5th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981); *McAlester v. Brown,* 469 F.2d 1280, 1282 (5th Cir.1972).

■ If Blackwell in fact arrested the plaintiffs at the dump, his actions do not meet any of the *McAlester* criteria. Louisiana Justices of the Peace may issue arrest warrants but they have no power to make an arrest in person, 1948–50 Op.La.Att'y Gen. at 240, so the act was not one judges ordinarily perform. Furthermore, the plaintiffs were not in Blackwell's official quarters, the "arrest" related to no case pending before him, and the plaintiffs were not dealing with him as a judge at the time. "When it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and ... no party has invoked the judicial machinery for any purpose at all ...," his acts are nonjudicial. *Harper,* 638 F.2d at 859. *See also Krueger v. Miller,* 489 F.Supp. at 330 (Justice of the Peace acted nonjudicially in arresting plaintiff in plaintiff's home).

Given the conflict in testimony concerning whether Blackwell arrested the plaintiffs at the dump, a reasonable juror might have credited the testimony that he did.

### 2. The Pursuit of Brewer

One of the few uncontested facts in this case is that Joseph Brewer, after leaving the dump, fled to Slidell seeking help from his supervisor. Blackwell pursued Brewer in his private automobile, and the two arrived almost simultaneously at the supervisor's home. Although what happened after this is disputed,[13] pursuing Brewer was, under the *McAlester* standards, a nonjudicial act. Nevertheless, Blackwell's acts would

not constitute a separate deprivation giving rise to liability under § 1983.

■ Under the Supreme Court's decision in *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), the validity of continuing detention depends on the validity of the initial restraint. In this case we have concluded that judicial immunity did not shield Blackwell if he made the arrest at the dump. If, therefore, the arrest was invalid, then the chase was but a continuation of an unlawful detention, not a separate § 1983 violation.

If, however, Yates made the arrest or its validity as a citizen's arrest is established, Blackwell's chase was not a constitutional wrong. A valid arrest extinguishes a prisoner's liberty interest until "the lapse of a certain amount of time deprive[s] the accused of liberty without due process of law." *Id.* at 145, 99 S.Ct. at 2694, 61 L.Ed.2d at 442.

### 3. The "Trial"

■ Justices of the Peace in Louisiana have jurisdiction to try minor civil cases. Their criminal jurisdiction is "as committing magistrates only, and [they] shall have the power to bail or discharge, in cases not capital or necessarily punishable at hard labor, and may require bonds to keep the peace." La.Rev.Stat.Ann. § 13:2584(C) (West Supp.1982).[14] As the *Stump* Court held, a criminal trial conducted by a judge without the power to hear criminal cases would be an act in the "clear absence of jurisdiction." *See supra* n. 12. Therefore, if Blackwell in fact tried the plaintiffs, he would not be immune from § 1983 liability.

Again, the testimony about what happened at Blackwell's is conflicting. Blackwell and Yates testified that the plaintiffs were not tried, and Blackwell denied making any of the alleged statements. Both men testified that Blackwell merely set bond for the plaintiffs.

---

**13.** There was also contradictory testimony about whether Blackwell had a gun on the seat of his car. Supervisor Reavis testified that a gun was in the car, but also stated that Brewer had made the decision to return with Blackwell before seeing the gun.

**14.** The language initially appeared in La. Const. art. 7, § 48 (1921), and was continued in effect as a statute by La. Const. art. 14, § 16 (1974). *See* 1936–38 Op.La. Att'y Gen. at 422, 426.

Three of the plaintiffs testified that they understood that they were required to plead guilty or were found guilty, and that they were assessed a "fine." Matherne stated that he "took it to understand" his guilt from Blackwell's remark that the plaintiffs had been seen dumping and from the "general discussion," but that Blackwell never found the plaintiffs guilty or ordered them to plead guilty. He testified that Blackwell "lev[ied] a bond on" the plaintiffs.

Finally, Assistant District Attorney Sinns testified that he spoke with Blackwell by telephone while the parties were at Blackwell's residence; Blackwell told him that the plaintiffs had already pleaded guilty, and Sinns then protested that Justices of the Peace have no criminal jurisdiction. Blackwell denied receiving the call.

Despite the conflict in this testimony a reasonable juror might have concluded that Blackwell conducted a trial of the plaintiffs on a criminal charge over which he had no jurisdiction.

#### 4. The Hold-Harmless Agreement

There is not a shred of evidence in the record that Blackwell was in any way involved with or responsible for securing the hold-harmless agreement. No reasonable juror could have found otherwise, so the district court correctly directed a verdict in favor of Blackwell on this point.

### B. Pendent State Claims

■ In *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court stated that ordinarily state pendent claims arising out of a common nucleus of operative fact with federal claims should be heard by the federal court unless: the federal claims were dismissed before trial, *id.* at 726, 86 S.Ct. at 1138, 16 L.Ed.2d at 228; the state claims "substantially predominate," *id.;* or dismissal would avoid "[n]eedless decisions of state law." *Id.*

In this case, after directing a verdict for Blackwell on the federal claims, the district judge dismissed the state claims for the second and third of these reasons. He stated that state issues controlled and that there were several issues on which the state courts had provided no guidance. These issues were: the extent of a justice of the peace's jurisdiction under Louisiana law; the extent of judicial immunity under Louisiana law, and the status of Civil Code Article 2315 as a remedy against Blackwell.

The district judge should have submitted the state claims to the jury. *Gibbs* rests on "considerations of judicial economy, convenience and fairness to the litigants." *Id.* Requiring the litigants to undertake a full-blown trial on the merits and then dismissing the state claims for lack of jurisdiction does not serve these policies. We understand the district court's reluctance to explore difficult questions of Louisiana law. But, as the Court stated in *Gibbs:* "We cannot confidently say ... that the federal issues were so remote or played such a minor role at the trial that in effect only the state claims were tried." *Id.* at 738, 86 S.Ct. at 1140, 16 L.Ed.2d at 235. Furthermore, as set forth elsewhere in this opinion, there is Louisiana authority on each of the disputed issues although this was not fully called to the judge's attention.

Because we have concluded that the judgment in Blackwell's favor must be reversed in part, the plaintiffs are free to reassert those state claims not resolved by this opinion. Alternatively, the unresolved claims may be voluntarily dismissed and asserted in the state court.[15]

### IV. Chief McGehee

### A. The § 1983 Claim

■ Police officers are not absolutely immune from civil liability for § 1983 violations. Instead, the Supreme Court held in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), that they enjoy immunity only if they acted in good faith.

The Court long adhered to a two-part test for determining the official's good faith. The first prong was objective: whether the official knew or reasonably should have

---

**15.** In their brief, the plaintiffs-appellants contended that the claims are now barred by prescription. However, both sides, upon direct inquiry by the court, now agree that the running of the prescriptive period was interrupted by the filing of and service of process in the federal suit. *See* La.Civ.Code Ann. arts. 3642, 3643 (West Supp. 1982).

known that his conduct would violate the plaintiff's constitutional rights. The second prong was subjective: whether the official acted with malicious intention to deprive the plaintiff of constitutional rights or with a similar bad motive. *See, e.g., Procunier v. Navarette,* 434 U.S. 555, 562–63, 566, 98 S.Ct. 855, 859–60, 862, 55 L.Ed.2d 24, 30–31 (1978); *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214, 224 (1975).

In *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court eliminated the second prong of the good-faith test. The Court explained that the costs attending litigation of subjective good faith are "peculiarly disruptive of effective government." *Id.* at ——, 102 S.Ct. at 2738, 73 L.Ed.2d at 410.[16] Therefore, the good faith of government officials performing discretionary functions is now to be tested only by the objective standard. Officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at ——, 102 S.Ct. at 2738, 73 L.Ed.2d at 410.

The plaintiffs allege that Chief McGehee committed two constitutional wrongs. First, they claim that he detained them in violation of their right to be free from unlawful searches and seizures. The absence of merit in the claim is determined by *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The plaintiff there was arrested pursuant to a facially valid warrant. The Court held that, although he had been deprived of liberty by the officer in whose custody he was placed,

he had received all process that was due when the magistrate made a probable cause determination before issuing the warrant. The Court stated that the official charged with maintaining custody of the accused named in a valid warrant is not "required by the Constitution to perform an error-free investigation of . . . a claim [of innocence]." *Id.* at 146, 99 S.Ct. at 2695, 61 L.Ed.2d at 443.

■ The plaintiffs here were likewise detained pursuant to facially valid warrants. The Chief of Police acted correctly in booking them and holding them until properly ordered to do otherwise. Neither Louisiana statute nor its jurisprudence, so far as called to our attention, declares that a district attorney may order release of a prisoner committed by a judge. Indeed, the only Louisiana authority we have found is to the contrary. *Proceedings ex rel. Judge of Section A of Criminal District Court v. Grosch,* 222 La. 937, 64 So.2d 225 (1953).[17]

■ The hold-harmless agreement, however, presents a different situation. If in fact McGehee required the plaintiffs to sign the agreement before releasing them, he deprived them of their right to liberty by threatening to detain them unless they signed it. Demanding execution of such a worthless document as a condition of their release was not ministerial function, and no justification for the detention is asserted.

There is testimony from which a reasonable juror might have concluded that McGehee made signing the agreements a condition for releasing the prisoners from custody. Therefore, we reverse the grant of a directed verdict on this issue.[18]

---

16. *Harlow* dealt with a direct action under the Constitution, and not with a § 1983 claim. Although the Court was careful to draw attention to this point, it intimated that there should be no difference in the standards for good faith immunity between the two sorts of cases. *See* —— U.S. at —— n. 30, 102 S.Ct. at 2738 n. 30, 73 L.Ed.2d at 410 n. 30. Indeed, because the number of § 1983 actions brought in federal court far outstrips the number of direct actions under the Constitution, the Court's rationale—the cost of litigating subjective good faith—applies forcefully to § 1983 cases.

17. Even if this case were to come within some exception to the *Baker* rule, allowing the plaintiffs to state a claim, Chief McGehee's good faith, uncontradicted in the record, would shield him from liability for keeping control over the plaintiffs. *See Turner v. Raynes,* 611 F.2d at 93 (sheriff's immunity for execution of valid warrant).

18. We do not resolve the question whether McGehee may be entitled to good-faith immunity based on the advice of the City Attorney. This is a matter for the district court on remand.

## B. *Pendent State Claims*

 The plaintiffs claim that McGehee falsely imprisoned them by failing to release them after Sinns' phone call. Under Louisiana law, the pendent state claims relating to the detention of the plaintiffs by Chief McGehee, except for requiring their execution of the hold-harmless agreement, have no more merit than the federal claims. False arrest or imprisonment occurs when a person is arrested or imprisoned without any legal process or warrant, or pursuant to a warrant that is either null and void on its face or maliciously and wrongfully obtained. *Singleton v. Townsend,* 339 So.2d 543 (La.App.1976). *See also Cox v. Cashio,* 96 So.2d 872 (La.App.1957) (distinguishing between false imprisonment and malicious prosecution). The sole question in false imprisonment cases is whether the police officer acted without color of legal authority. *Kyle v. City of New Orleans,* 353 So.2d 969 (La.1977); *Conques v. Fuselier,* 327 So.2d 180 (La.App.1976).

Because the plaintiffs were placed in the custody of Chief McGehee pursuant to a valid arrest warrant, he had no choice but to detain them until ordered to release them. A Louisiana court could not hold him liable for false imprisonment.

 Chief McGehee's failure instantly to release the plaintiffs after the telephone call from Kurt Sinns does not create liability. The decision in *Proceedings ex rel. Judge,* 222 La. at 943, 64 So.2d at 228, indicates that judicial officers have plenary authority over prisoners. We need not decide whether this decision retains its force in light of the repeal of La.Rev.Stat.Ann. § 15:78 (West 1951), for Chief McGehee's action in continuing to detain the prisoners after Sinns' call was not "without color of legal authority." *Kyle,* 353 So.2d at 971. And, as we have already noted, there is no

authority for the district attorney to order the prisoners' release. Because McGehee acted with a colorable claim of legal authority in detaining the plaintiffs, we affirm the directed verdict in his favor on the state false imprisonment claim.[19] *See Firstley v. Bill Watson Ford, Inc.,* 268 So.2d 314, 317 (La.App.1972).

## V. The Town of Pearl River

The Supreme Court held in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that a municipality is liable for its officials' torts only when the official acts pursuant to municipal direction or authorization or when the act carries out municipal policy or custom. *Id.* at 690, 692–694, 98 S.Ct. at 2036, 2037–38, 56 L.Ed.2d at 635, 636–637. The plaintiffs claim that their detention and the requirement that they sign the hold-harmless agreement was attributable to the town.

We have already concluded that the detention did not constitute a violation of § 1983 because the plaintiffs received all the process due them. Therefore, they have failed to state a claim against the Town, and the district court properly directed a verdict on this issue.

 With respect to the hold-harmless agreement, counsel for the Town stated at oral argument that it was not the Town's policy to require prisoners to sign such agreements before their release. The agreement was apparently a special creation for this case. Therefore, the act was not pursuant to municipal policy or custom. Furthermore, because it was never authorized or ratified by municipal policymakers,[20] it cannot be the basis of § 1983 liability against the Town. *Monell* expressly forbids imposition of municipal liability on a

---

**19.** This does not dispose of the claim that the plaintiffs were again falsely imprisoned between the time they should have been released and their signing the hold harmless agreement. If on remand the plaintiffs prove their claim, this incident would appear to be a detention without color of legal authority, *see Norrell v. City of Monroe,* 375 So.2d 159, 162 (La.App.

1979), for which Chief McGehee could be held liable.

**20.** Pearl River is governed by a Mayor and a Board of Aldermen. Plaintiffs presented no evidence that the Mayor or Aldermen authorized or ratified the decision to seek the hold-harmless agreement.

respondeat superior theory. *Id.* at 690, 98 S.Ct. at 2036, 56 L.Ed.2d at 635.

The plaintiffs argue that, because McGehee controls the jail, he is a "final authority" for the municipality and his conduct represents official policy. They rely on *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980).

This argument misapprehends the court's holding in *Briscoe.* The official in that case, a Texas county judge:

[H]olds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein. Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held liable under section 1983.

*Id.* at 404 (quoting *Monell,* 438 U.S. at 694, 98 S.Ct. at 2038, 56 L.Ed.2d at 637) (citations omitted).

▆ Chief McGehee's position is far lower in the official hierarchy than that of a Texas county judge. The Chief is accountable to the Mayor and to the Aldermen. He presides over the jail facility but does not hold "absolute sway" over his tasks, as demonstrated by the various telephone conversations instructing him to hold the plaintiffs, to release them, and to have them sign the hold-harmless agreements. He is simply not the final repository of town power.

Thus, his actions cannot fairly be said to represent town policy.[21]

▆ The district court properly directed a verdict in favor of the city on the federal claims. We affirm that judgment. With respect to the state claims, we affirm the judgment in favor of the city relating to the initial detention for the reasons stated in Part IVB of this opinion. We reverse the judgment with respect to the detention allegedly conditional on the plaintiffs' signing the hold-harmless agreement because, at least in false arrest cases, Louisiana law permits vicarious municipal liability for police officers' torts. *See Applewhite v. City of Baton Rouge,* 380 So.2d 119, 121–22 (La. App.1979); *Norrell v. City of Monroe,* 375 So.2d at 160–61.

## VI. Conclusion

A. The disposition of the federal claims against Blackwell is AFFIRMED IN PART and REVERSED IN PART. The dismissal of the state claims is REVERSED.

B. The directed verdict on the federal claims against Chief McGehee is AFFIRMED IN PART and REVERSED IN PART. The directed verdict on the state claims is AFFIRMED IN PART.

C. The directed verdict on the federal claims against the Town of Pearl River is AFFIRMED. The directed verdict on the state claims is AFFIRMED IN PART.

The case is REMANDED for proceedings consistent with this opinion. In doing so, we intimate no opinion that the plaintiffs

---

21. *Van Ooteghem v. Gray,* 628 F.2d 488 (5th Cir.1980), *modified en banc,* 654 F.2d 304 (5th Cir.1981) (per curiam), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982), also considered a situation in which a local official's decisions were allegedly the official policy of a municipality. The panel opinion held that Gray, a Texas county treasurer, had "unbridled authority" to hire and fire employees, transforming his actions into county policy in that area. 628 F.2d at 494–95.

The en banc opinion "decline[d] to reach or rule on [the official policy issue] without additional factual guidance and an express determination by the district court." 654 F.2d at 306. Therefore, the panel's decision does not bind us here. Even if it did, however, its conclusion that Gray was "an elected official equal in authority to the County Commissioners in his domain," 628 F.2d at 495, would, for reasons discussed in the text, distinguish the broad authority of the official in that case from Chief McGehee's limited authority here.

The plaintiffs have not alleged that the conversation between McGehee and the City Attorney leading to the decision to require the hold-harmless agreement satisfies the "policy" requirement of *Monell.* Indeed, the City Attorney is not a defendant in this case. We decline to consider this question, which was not raised in the district court.

have presented a claim for serious damage. Three testified that they lost no wages; one testified that he lost only one day's pay. None was physically abused. None was a victim of unconstitutional discrimination. If, however, state officials intentionally abused their office, the action is not to be condoned because they did not inflict a major hurt. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[22]

---

**22.** It might be argued that the deprivation in this case, even under the plaintiffs' version of the facts, was so minimal that it did not rise to the level of a § 1983 violation. *See Ingraham v. Wright,* 430 U.S. at 674, 97 S.Ct. at 1414, 51 L.Ed.2d at 732. We agree with the position taken by the Fourth Circuit:

[A]n individual, not under the disability of prison confinement . . . has an "incontrovertible" right—a right always "of constitutional dimensions" to be free from unreasonable interference by police officers and to enjoy "security from 'arbitrary intrusion by the [state].'"

*Pritchard v. Perry,* 508 F.2d 423, 426 (4th Cir. 1976). *Accord Harper v. McDonald,* 679 F.2d 955, 959–60 (D.C.Cir.1982) (per curiam); *Joseph v. Rowlen,* 402 F.2d 367, 370 (7th Cir. 1968).